Madeline MALDONADO,
et al., Plaintiff(s)

v.

MUNICIPALITY OF BARCELONETA,
et al., Defendant(s).

Civil No. 07–1992 (JAG).

United States District Court,
D. Puerto Rico.

Jan. 19, 2010.

See also 568 F.3d 263.

Maria S. Kortright–Soler, M.S. Kortright Soler Law Office, San Juan, PR, Pedro R. Vazquez, III, Pedro R. Vazquez Law Office, Guaynabo, PR, for Plaintiffs.

Luis F. Colon, Colon Gonzalez Law Office, Robert Freedman, Luis F. Colon–Conde, C. Conde & Mirandes, Miguel A. Pereira, Luis F Colon & Associates, Wandymar Burgos–Vargas, P.R. Department of Justice, Guillermo A. Macari–Grillo, Macari Law Office, Jose J. Gueits–Ortiz, Department of Justice of Puerto Rico, Robert Millan, Millan Law Office, Enrique Velez–Rodriguez, Miriam R. Ramos–Grateroles, Miriam Ramos Grateroles, San Juan, PR, Marcos Valls–Sanchez, Marcos Valls Sanchez, Trujillo Alto, PR, for Defendants.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

The twenty-seven named plaintiff families in the case at bar, all residents of three public housing complexes located in Barceloneta, Puerto Rico (collectively "Plaintiffs"), bring a civil rights suit under 42 U.S.C. §§ 1983, 1985, and 1986 against Defendants asserting violations of their rights under the United States Constitution. Specifically, Plaintiffs allege that the precipitous seizure and cruel killings of their pet cats and dogs by Defendants violated their Fourth Amendment rights to be free from the unreasonable seizure of their "effects," and their Fourteenth Amendment substantive and procedural due process rights. Plaintiffs also proffered claims under the Fifth Amendment to the United States Constitution and supplemental law claims under the laws and Constitution of the Commonwealth of Puerto Rico. Plaintiffs are seeking compensatory and punitive damages, costs, attorney's fees, declaratory judgment, injunctive relief, prejudgment and post-judgment interest, and the value of their pets. (*See* Docket No. 36).

Plaintiffs' claims under the Fifth Amendment and 42 U.S.C. § 1985 against Defendants the Municipality of Barceloneta ("the Municipality"), Mayor Luis Fontanes ("the Mayor"), Elsa Perez ("Perez"), and the conjugal partnership Fontanes–Perez were dismissed by this Court. (Docket No. 91). Furthermore, the First Circuit ordered the dismissal of Plaintiffs' substantive due process claims under the Fourteenth Amendment. (Docket No. 233). *Maldonado v. Fontanes,* 568 F.3d 263, 271 (1st Cir.2009).

Defendants the Mayor, the Municipality ("Defendants I"), Leonides Gonzalez, Sylvia Riquelme, Esther Ruiz, Ahmid Molina Morales and Edgardo Santiago ("Defendants II") (collectively "Defendants") move for summary judgment. (Docket Nos. 182 and 197). For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part Defendants' motions.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties summary judgment pleadings reveal the following uncontested material facts. All of the Plaintiffs' households are located in three public housing developments in the Municipality of Barceloneta. (Docket No. 182–2 at 1, ¶ 1 & Docket No. 214–2 at 1–2, ¶ 1). Of the 85 Plaintiffs, 56 are minor children. (Docket No. 182–2 at 1, ¶ 2 & Docket No. 214–2 at 2, ¶ 2). All of the adult Plaintiffs voluntarily entered into a lease with the responsible public housing authority. (Docket No. 182–2 at 1, ¶ 3 & Docket No. 214–2 at 2, ¶ 3). The leases stated that the tenants agreed to abide by the Admission and Continued Occupancy Policies of the Public Housing Authority ("PHA"). (Docket No. 182–2 at 1, ¶ 4 & Docket No. 214–2 at 2, ¶ 4).

On October 1, 1999, the United States Congress approved 42 U.S.C. § 1437z–3, a public health and welfare law that allowed public housing residents to own and have in their dwelling one or more household pets. (Docket No. 214–2 at 38, ¶ 1 & Docket No. 230–2 at 3, ¶ 4). Title 24 C.F.R. § 960.707 allows a public housing resident to own one or more common household pet or have one or more household pet present in the dwelling of such resident, subject to reasonable requirements of PHA. (Docket No. 214–2 at 38, ¶ 2 & Docket No. 230–2 at 3, ¶ 4). In the year 2000, the Municipality of Barceloneta passed Ordinance No. 33, which did not allow residents to have pets in urbanizations, the town center, and in housing developments. (Docket No. 214–2 at 38, ¶ 3 & Docket No. 230–2 at 3, ¶ 4).

From 2003 to 2006, the Puerto Rico Public Housing Authority ("PRPHA") submitted to the United States Department and Housing Development ("HUD") an Annual Plan, and their Five Year Plan, which contained the policies under which they work. (Docket No. 214–2 at 39, ¶ 4 & Docket No. 230–2 at 3, ¶ 4). The Annual Plan is the document that the PHA submits to HUD under 24 C.F.R. § 903.4. (Docket No. 214–2 at 39, ¶ 5 & Docket No. 230–2 at 3, ¶ 4). The 2007 Annual Plan and the Five Year Plan was approved by HUD on June 25, 2007, and is in effect as of July 1, 2007. (Docket No. 214–2 at 39, ¶ 6 & Docket No. 230–2 at 3, ¶ 5). In 2007, PRPHA approved a pet policy consistent with the federal laws and regulations that allowed public housing residents to have pets. (Docket No. 214–2 at 39, ¶ 7 & Docket No. 230–2 at 3, ¶ 5). PRPHA's policy (hereinafter referred to as the "2007 Pet Policy") provided that "[p]et ownership shall be limited to common household pets, which shall be defined to include only dogs, cats, caged birds, commonly kept as pets, tropical fish, frogs, iguanas and tur-

tles kept in aquariums, other small caged animals, and no other species of animal; the pets must be registered with PRPHA or Management Agents." (Docket No. 214–13, Exh. 7 at 5 ¶ C). In September 2007, the PRPHA provided training to the Municipalities, including the Municipality of Barceloneta, on the management of public housing under federal laws and regulations. (Docket No. 214–2 at 39, ¶ 9 & Docket No. 230–2 at 4, ¶ 3).

On October 1, 2007, the Municipality of Barceloneta began to manage the three public housing complexes where Plaintiffs reside. (Docket No. 214–2 at 44, ¶ 24 & Docket No. 230–2 at 5, ¶ 5). In doing so, the Municipality of Barceloneta agreed to comply with the PRPHA's formally adopted policies for grievance procedures and hearings (formal or informal) and any other required procedure in compliance with 24 C.F.R. part 966, subpart B and any other federal or state regulation. (Docket No. 214–2 at 40, ¶ 11; Docket No. 214–16, Exh. 10A at 11–12 ¶ 8.4 & Docket No. 230–2 at 4, ¶ 4). On October 2, 2007, the Municipality of Barceloneta, through the administrators of each public housing development, drafted a letter notifying residents of the public housing developments that they could not have pets in their residences and that their lease contracts could be canceled if they did not comply with the prohibition. (Docket No. 214–2 at 44, ¶ 25; Docket No. 214–31, Exh. 20 & Docket No. 230–2 at 5, ¶ 5). The letter was signed by the administrators on October 3, 2007 (hereinafter referred to as "the letter"). (Docket No. 214–2 at 44, ¶ 26; Docket No. 214–31, Exh. 20 & Docket No. 230–2 at 6, ¶ 2).

On October 5, 2007, the Municipality of Barceloneta issued a purchase order to Animal Control Services ("ACS") to collect up to 50 animals. (Docket No. 214–2 at 44, ¶ 28 & Docket No. 230–2 at 6, ¶ 4). From

that same day until October 7, the administrators personally delivered the letter to the residents. The letter, however, did not state that officials would enter the housing developments on any date in particular to enforce the prohibition against owning pets. (Docket No. 214–2 at 44, ¶ 27 & Docket No. 230–2 at 6, ¶ 3). On October 8, 2007, the Mayor, along with employees from both the Municipality and ACS, went into each of the public housing communities in order to execute an operation for the pick up of the pets owned by the public housing residents. (Docket No. 214–2 at 45, ¶ 31; Docket No. 230–2 at 7, ¶ 1 & Docket No. 239–3, Exh. 27 at 2–3).

Municipal employees asked residents whether they had any pets that needed to be turned over as required by the purported pet policy. (Docket No. 239–2, Exh. 23 at 2). About 50 to 80 animals were seized from the public housing complexes. (Docket No. 214–24, Exh. 30). The animals were injected with a yellowish-green color liquid, after which some of the animals became dazed while others did not move. (Docket No. 214–2 at 49, ¶ 51). All the animals picked up, were put in one van that contained only six to eight plastic crates. (Docket No. 214–2 at 48, ¶ 48). Some of the animals picked up were beaten against the van. (Docket No. 214–2 at 58, ¶ 122).

Thereafter, some of the pets picked up were thrown from a bridge known as "Paseo del Indio." (Docket No. 239–4, Exh. 28 at 2; Docket No. 214–37, Exh. 26 at 15 & 214–2 at 70 ¶ 205). At the bottom of the "Paseo del Indio" Bridge there were many dead dogs and broken tree limbs scattered around. (Docket No. 214–2 at 70, ¶¶ 206 and 207). Also, a dog was found hanging from a tree. (Docket No. 214–2 at 85, ¶ 317; Docket No. 238–6, Exh. 14 at 2).

On October 10, 2007, another operation took place in which pets in possession of public housing residents were taken. (Docket No. 182, Exh. 38 at 48–49). The animals underneath the "Paseo del Indio" Bridge were buried on October 12, 2007. (Docket No. 214–2 at 86, ¶ 321; Docket No. 238–6, Exh. 14 at 3).

On October 17, 2007, the Municipality of Barceloneta fully relinquished its administrative duties to operate the public housing developments. (Docket No. 182–2 at 8, ¶ 45 & Docket No. 214–2 at 37, ¶ 45). Since October 17, 2007, the public housing facilities have not been administered by the Municipality of Barceloneta. (Docket No. 182–2 at 9, ¶ 46 & Docket No. 214–2 at 38, ¶ 46).

On May 29, 2009, Defendants I filed a motion for summary judgment. In their motion, Defendants I argued that Plaintiffs' federal claims against them under the Fourth Amendment and the Fourteenth Amendment's procedural due process clause should be dismissed. Defendants I divide the twenty-seven (27) plaintiff families into four groups. One group is comprised of twelve (12) plaintiff families who allegedly never lost an animal. Defendants I argue that the following plaintiff families lack standing: (1) Carmen Luz Agosto and her children: Priscilla Howard, John Howard, Edwin Howard, and Joshua Lamoutte; (2) Lisette Agosto Roman and her child: Byron Cancel; (3) Daisy Caballero Cruz and her children: Wilfredo de Leon Caballero, Adnersy Rodriguez Caballero, Rafael J. Rodriguez Caballero, and Melquisedec Maisonet Caballero; (4) Evelyn Talavera and her children: Hector and Luis Laureano; (5) Vanessa Gutierrez and her children: Stephanie Moya and Kenneth Escobar; (6) Elba Iris Guzman Reyes; (7) Blanca Iris Medina Cruz and her child: Carla Michelle Colon; (8) Mariyunaira Rivera and her child: Victor Manuel Negro; (9) Andrea Rodriguez Otero

and her husband: Feliz de Leon; (10) Jacqueline Santiago Casanova and her child: Kiara Rodriguez Santiago; (11) Evelyn Soler Davila; and (12) Elvia Tirado (collectively referred to as "the Twelve Plaintiff Families"). Another group consists of four (4) plaintiff families who allegedly delivered their pets to Defendants. The third group includes four (4) plaintiff families whose pets were allegedly taken from public areas in the housing projects. The final group is comprised of seven (7) plaintiff families whose pets were allegedly taken from the balcony area of their residences.

First, Defendants I submit that the claims proffered by the Twelve Plaintiff Families should be dismissed because they lack standing to bring a suit, as they have not lost any animals nor suffered an intrusion into their homes. Second, Defendants I argue that the Mayor's acts did not contravene the Fourth Amendment.[1] According to Defendants I, the Mayor merely knocked on the doors of Plaintiffs' residences to solicit a consensual conversation with them regarding their pets. Defendants I stress that the Mayor did not intrude to any area where Plaintiffs had a reasonable expectation of privacy. The Mayor concedes that together with the other Defendants, he had to walk across the balcony areas of the residences and go up stairs in order to knock on the doors of Plaintiffs' residences. Defendants I contend that even if Plaintiffs consider the balcony areas and stairs leading to their door private areas, such an expectation of privacy is unreasonable. Third, Defendants I argue that the Fourth Amendment was not violated because none of the Plaintiffs were "coerced" into giving their pets,

as Defendants engaged in a consensual conversation with Plaintiffs after which, some handed over their pets, while others refused to hand over their pets. According to Defendants I, the Plaintiffs that refused to hand over the pets suffered no negative consequences. Fourth, Defendants I address the Fourth Amendment claims of the Plaintiffs whose animals were taken while allegedly running loose in a public area. Defendants I contend that those Plaintiffs whose animals were collected from public areas do not have a Fourth Amendment claim because by letting their animal run loose they waived any protection they had under the Fourth Amendment. Moreover, Defendants I submit that the Defendants that collected the animals running in public areas acted reasonably because those animals were reasonably deemed to be dangerous or strays. Fifth, Defendants I argue that those Plaintiffs whose pets were allegedly taken from the balconies have failed to submit any evidence beyond their own conjectures that their animals were located in their balconies. In addition, Defendants I claim that Plaintiffs lack a reasonable expectation of privacy over the balconies. Defendants I submit that the balcony areas are comprised of concrete slabs which are open to the public and fail to create a barrier that prevents animals from wandering into the public areas of the housing projects. Sixth, Defendants I argue that even if some of the Defendants' actions constituted an intrusion of an interest protected by the Fourth Amendment, the Defendants' actions were not invasive but administrative in nature and, therefore, did not violate the Fourth Amendment. Seventh, Defendants I contend that the Mayor is entitled to qualified immunity

---

1. The Fourth Amendment, which guards against unreasonable searches and seizures, states in relevant part that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

because it is not clearly established that his acts were in violation of the Fourth Amendment. Specifically, the Mayor stresses that his efforts to collect stray animals that threatened the health of the residents of the housing projects, while at the same time offering to collect non-conforming animals kept by the residents, was not in contravention with the rights established by the Fourth Amendment. Eighth, Defendants I aver that Plaintiffs' claims against the Municipality should be dismissed because there was no official policy of the Municipality in place that resulted in or compelled the violation of Plaintiffs' constitutional rights. Ninth, Defendants I allege that Plaintiffs' procedural due process clause claims should be dismissed because the dismissal of Plaintiffs' claims under the Fifth Amendment eliminated the basis for their procedural due process claim. Finally, Defendants I argued that Plaintiffs' request for injunctive relief should be denied because the Municipality of Barceloneta was no longer the administrator of the public housing complexes, rendering Plaintiffs' request moot. (Docket No. 182).

On June 5, 2009, Defendants II submitted their motion for summary judgement. In their motion, Defendants II first argued that the Fourth Amendment claims against some of them should be dismissed because they did not enter any of the housing units. Second, Defendants II submit that the Fourth Amendment claims based on the alleged unlawful entry of Plaintiffs' residences should be dismissed because the entry into any of the residences occurred after the owner gave con-sent to enter the residence. Third, Defendants II allege that Plaintiffs have failed to submit a cognizable claim under § 1983 against them because Plaintiffs have failed to show that Defendants II's conduct was causally connected to the alleged deprivation of Plaintiffs' rights under the Fourth Amendment. Additionally, Defendants II allege that there is no cognizable claim under § 1983 because Plaintiffs have failed to show that the raids that occurred in the housing projects violated the Fourth Amendment. Fourth, Defendants II contend that they are entitled to qualified immunity from Plaintiffs' Fourth Amendment claims. (Docket No. 197).

Plaintiffs opposed Defendants' motions for summary judgement. (Docket Nos. 214 and 224). On July 17, 2009, Defendants II replied to Plaintiffs' opposition. (Docket No. 243). Defendants' motions for summary judgment were referred to a Magistrate Judge for a Report and Recommendation. (Docket No. 242). On November 16, 2009, the Magistrate Judge issued his Report and Recommendation.

■ The Magistrate Judge found that the Twelve Plaintiff Families' claims should be dismissed because they lacked standing. The Magistrate Judge first struck from the record the exhibit in which Defendants I relied on for their proposition that the Twelve Plaintiff Families' did not suffer any damages because they did not lose their pets nor suffered any intrusion into their homes. The exhibit was stricken from the record because it was not properly authenticated.[2] The Magistrate Judge, nonetheless, ferreted through

2. It has long been settled law that "[d]ocuments supporting or opposing summary judgment must be properly authenticated." *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) (citing Fed.R.Civ.P. 56(e)). Unless an exhibit is self-authenticating pursuant to Fed.R.Evid. 902, the exhibit must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). *Id.* (internal citation omitted). The failure to authenticate precludes the consideration of the supporting documents at the summary judgment stage. *Id.*

the record and found that there was no evidence that would in fact demonstrate that these plaintiffs lost any pets or "suffer[ed] any type of damages as a result of the defendants' actions. (Docket No. 262 at 17). Accordingly, the Magistrate Judge recommended the dismissal of the Twelve Plaintiff Families' claims because of lack of standing. In addition, the Magistrate Judge recommends that this Court not exercise supplemental jurisdiction over the Twelve Plaintiff Families' state law claims.

Next, the Magistrate Judge recommended that Defendants' request for summary judgment on Plaintiffs' Fourth Amendment claim be denied. The Magistrate Judge noted that pursuant to the Fourth Amendment, Plaintiffs' pets were protected from unreasonable search and seizures. Furthermore, the Magistrate Judge acknowledged that the killing of a person's pet without the owner's consent is a seizure for purposes of the Fourth Amendment. The Magistrate Judge concluded that Plaintiffs' Fourth Amendment claims could not be summarily disposed of because there were genuine issues as to the following material facts: (1) that some of the Plaintiffs voluntarily delivered their animals to Defendants; (2) that Defendants engaged in a consensual conversation with Plaintiffs; (3) that Defendants intruded into areas where Plaintiffs had a reasonable expectation of privacy; and (4) that some of the animals taken were dangerous or strays in a public area of the housing projects. Additionally, the Magistrate Judge concluded that Defendants failed to demonstrate that there was no genuine issue that their conduct was not causally connected to the deprivation of Plaintiffs' federal rights. Likewise, because of the material facts in genuine dispute, the Magistrate Judge determined that the Mayor and Defendants II's request for qualified immunity should be denied. Moreover, the Magistrate Judge

disagreed with Defendants I's argument that their actions were administrative in nature and, therefore, did not violate the Fourth Amendment. The Magistrate Judge also found unavailing the Municipality's contention that Plaintiffs' claims against it should be dismissed because there was no official policy of the Municipality in place that resulted in or compelled the violation of Plaintiffs' constitutional rights.

The Magistrate Judge recommended that summary judgment be entered as to Plaintiffs' procedural due process claims under the Fourteenth Amendment. In his Report and Recommendation, the Magistrate Judge stated that "Plaintiffs were deprived of their property by the mayor's unauthorized acts." (Docket No. 262 at 49). The Magistrate Judge concluded that Plaintiffs' procedural due process claims should be dismissed because the existing state laws afforded Plaintiffs with sufficient post deprivation remedies. Finally, the Magistrate Judge recommended that Plaintiffs' request for injunctive relief be denied because it was moot. (Docket No. 262).

On November 24, 2009, Plaintiffs filed their objections. First, Plaintiffs objected to the Magistrate Judge's decision to recommend the dismissal of their Fourteenth Amendment procedural due process claims against Defendants. Plaintiffs contend that their rights under the Fourteenth Amendment were violated by Defendants because they were not provided with an opportunity to be heard before their pets were taken from them. According to Plaintiffs, the Mayor acted pursuant to Ordinance No. 33 when he ordered the removal of Plaintiffs' pets without a pre-deprivation hearing. Plaintiffs further argue that the Magistrate Judge erred in finding that Defendants' failure to provide a pre-deprivation hearing did not violate

the Fourteenth Amendment because the state tort laws provided adequate post deprivation remedies. Moreover, Plaintiffs objected to the Magistrate Judge's conclusion that their request for injunctive relief is moot. Plaintiffs stress that such request is not moot because Ordinance No. 33, which prohibits the owning of pets in public housing projects, has not been derogated, and therefore, can be enforced by Defendants I at any time. Finally, Plaintiffs objected to the dismissal of the claims submitted by the Twelve Plaintiff Families. Plaintiffs argue that the Twelve Plaintiff Families have standing to bring their claims under the Fourth and Fourteenth Amendments. Moreover, Plaintiffs object to the Magistrate Judge's statement that the Twelve Plaintiff Families did not "suffer any damages as a result of defendants' actions." (Docket No. 262 at 17). According to Plaintiffs, such statement could be misconstrued to indicate that the Twelve Plaintiff Families did not suffer any damages under federal or state law. Plaintiffs argue that the Magistrate Judge erred in making that statement because whether the Twelve Plaintiff Families' suffered damages under state law was not an issue raised by Defendants in their motions. (Docket No. 263).

On December 1, 2009, Defendants I objected to the Magistrate Judge's Report and Recommendation. Defendants I argue that the Magistrate Judge erred in not considering as uncontested facts that: (1) the conversations between Defendants and Plaintiffs were consensual; (2) the vast majority of Plaintiffs declined to deliver an animal; and (3) that the public housing complexes have a large number of strays. According to Defendants I, these facts are essential for determining whether their acts were in violation of the Fourth Amendment. Defendants I also contend that Plaintiffs' Fourth Amendment claims against the Mayor in his personal capacity

should be dismissed. Defendants I stress that the Mayor limited his actions to knocking on the doors of the residences and engaging in consensual conversations with the Plaintiffs where he asked them to voluntarily turn over their pets to the Municipality. Defendants I submit that such actions are not prohibited by the Fourth Amendment and cannot be classified as an "incursion" as stated by the Magistrate Judge in his Report and Recommendation. (Docket No. 262 at 27). Defendants I further argue that the Fourth Amendment claims against the Mayor in his personal capacity should be dismissed because he is entitled to qualified immunity.

Defendants I further aver that the claims by the four (4) plaintiff families that delivered their pets to Defendants (hereinafter "the Four Plaintiff Families I") cannot survive summary judgment because their pets were not "seized" for purposes of the Fourth Amendment. These Plaintiffs are: (1) Rafet Candelaria ("Candelaria"), (2) Jessica Fuentes, her husband Jose Rodriguez Marin and their children: David Fuentes and Jose E. Rodriguez Fuentes ("Fuentes Household"), (3) Ramona Ojeda Gonzalez ("Ojeda"), and (4) Maria Rios Colon and her children: Carlos David Colon, Leoniel Melendez, and Jesus Melendez ("Rios Household"). Likewise, Defendants I move for the dismissal of the claims proffered by the four (4) plaintiff families whose pets were taken from public spaces in the housing developments. These plaintiffs are: (1) Jennifer Jimenez and her children: Janice Torres and Joedniel Torres ("Jimenez Household"), (2) Sonia Kortright Sanchez ("Kortright"), (3) Maribel Rivera Varela and her children: Keysha Rivera and Naysha Rivera ("Rivera household"), and (4) Antonia Morales and her children: Kelvin Morales and Randy Morales ("Morales Household")(collectively referred to as "the Four Plaintiff

Families II"). According to Defendants I, the Four Plaintiff Families II's rights under the Fourth Amendment were not violated, as said Plaintiffs do not have any reasonable expectation of privacy in allowing their pets to run free in a public space. Defendants I aver that because the public housing developments were overrun with strays, the Four Plaintiff Families II's pets were reasonably deemed to be strays. Furthermore, Defendants I stress that one of the pets taken from the public area was of a dangerous breed. Defendants I also submit that the Fourth Amendment claims brought by the seven (7) plaintiff families whose pets were taken from their balcony area should be dismissed because the nature of the balcony areas, which consisted of concrete slabs, do not give rise to a right protected by the Fourth Amendment. These plaintiffs are: (1) Madeline Maldonado and her husband Abraham Valencia and their children: Alex Maldonado Valencia, Edgar Maldonado Valencia, and Christian Maldonado Valencia ("Maldonado Household"), (2) Angel Rafael Sierra and his wife Evelyn Vazquez and their children: Angelica, Karina, Sorimar, Christopher, Neysha, and Miguel Angel Sierra Vazquez ("Sierra Household"), (3) Angelica Valle and her children: Elbi Molina, Kelvin Molina, and Idaly Molina ("Valle Household"), (4) Carmen Valle ("Carmen Valle"), (5) Carmen Vazquez and her children: Derek Cruz and Alex Joel Vazquez ("Vazquez Household"), (6) Ruth Vidot and her children Jahaira Santana: Luisa Maria Santana, Grace Santana, Virgen Rivera, and Maria Dahlia Rivera ("Vidot Household"), and (7) Judith Varela and her children: Johamed Rivera, Julian Lopez Rivera, and Ashley Rivera ("Varela Household") (collectively referred to as "the Seven Plaintiff Families"). Finally, Defendants I contend that the Municipality cannot be held liable because an official policy of the Municipality was not responsible for the alleged deprivation of constitutional rights suffered by Plaintiffs. (Docket No. 272).

Defendants II also objected to the Magistrate Judge's Report and Recommendation, and move for the dismissal of Plaintiffs' personal and official capacity claims against them. Defendants II contend that Defendant Esther Ruiz ("Ruiz") never entered any of Plaintiffs' residences and, as such, she cannot be held liable under the Fourth Amendment. Moreover, Defendants II argue that Plaintiffs' Fourth Amendment claims against Defendant Leonides Gonzalez ("Gonzalez") should be dismissed because she did not enter any home, threaten any resident or remove any pet. For the just mentioned reasons, Defendants II aver that Plaintiffs' Fourth Amendment claims against Defendant Sylvia Riquelme ("Riquelme") should be dismissed. Defendants II also object to the Magistrate Judge's decision not to recommend the dismissal of the claims proffered against Defendant Ahmid Molina ("Molina") under the Fourth Amendment. According to Defendants II, Molina did not enter into any of Plaintiffs' homes and limited his actions to knocking Plaintiffs' doors and talking to them outside of their residences. In addition, Defendants II claim that Edgardo Santiago's ("Santiago") actions did not violate Plaintiff's rights under the Fourth Amendment. Defendants II concede that Santiago entered Plaintiff Jessica Fuentes' home. Defendants II, however, argue that Plaintiff Jessica Fuentes consented to Santiago's entry for the purpose of picking up her dog. According to Defendants II, Santiago's consensual entry into Plaintiff Jessica Fuentes' home was not in violation of her rights under the Fourth Amendment. (Docket No. 275). Both Plaintiffs and Defendants filed reply briefs. (Docket Nos. 277, 280, 283, 286, and 289).

## STANDARD OF REVIEW

1. *Standard for Reviewing a Magistrate–Judge's Report and Recommendation*

Pursuant to 28 U.S.C. § 636(b)(1)(B); Fed. R.Civ.P. 72(b); and Local Rule 503; a District Court may refer dispositive motions to a United States Magistrate Judge for a Report and Recommendation. *See Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.,* 286 F.Supp.2d 144, 146 (D.P.R. 2003). The adversely affected party may "contest the Magistrate Judge's report and recommendation by filing objections 'within ten days of being served' with a copy of the order." *United States of America v. Mercado Pagan,* 286 F.Supp.2d 231, 233 (D.P.R.2003) (citing 28 U.S.C. § 636(b)(1)). If objections are timely filed, the District Judge shall "make a *de novo* determination of those portions of the report or specified findings or recommendation to which [an] objection is made." *Rivera de Leon v. Maxon Eng'g Servs.,* 283 F.Supp.2d 550, 555 (D.P.R.2003). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," however, if the affected party fails to timely file objections, "the district court can assume that they have agreed to the magistrate's recommendation." *Alamo Rodriguez,* 286 F.Supp.2d at 146 (citing *Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247 (1st Cir.1985)).

2. *Summary Judgment Standard*

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." *Thompson v. Coca–Cola Co.,* 522 F.3d 168, 175 (1st Cir.2008) (citing Fed. R.Civ.P. 56(c)). The issue is "genuine" if it can be resolved in favor of either party. *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir.2004). A fact is "material" if it has the potential to change the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In prospecting for genuine issues of material fact, we resolve all conflicts and draw all reasonable inferences in the nonmovant's favor." *Vineberg v. Bissonnette,* 548 F.3d 50, 56 (1st Cir. 2008).

Although this perspective is favorable to the nonmovant, once a properly supported motion has been presented before this Court, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant this Court's denial of the motion for summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The opposing party must demonstrate "through submissions of evidentiary quality, that a trialworthy issue persists." *Iverson v. City of Boston,* 452 F.3d 94, 98 (1st Cir.2006) (internal citations omitted). Moreover, on issues "where [the opposing] party bears the burden of proof, it 'must present definite, competent evidence' from which a reasonable jury could find in its favor." *United States v. Union Bank for Sav. & Inv. (Jordan),* 487 F.3d 8, 17 (1st Cir.2007) (citing *United States v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992)). Hence, summary judgment may be appropriate, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." *Forestier Fradera v. Municipality of Mayaguez,* 440 F.3d 17, 21 (1st Cir.2006) (citing *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173

(1st Cir.2003)). It is important to note that throughout this process, this Court cannot make credibility determinations, weigh the evidence, and make legitimate inferences from the facts, as they are jury functions, not those of a judge. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## DISCUSSION

Pursuant to the objections submitted by the parties, this Court must determine whether Plaintiffs' claims against Defendants under the Fourteenth Amendment should be summarily disposed of. Moreover, we must address whether Defendants are entitled to summary judgment on Plaintiffs' Fourth Amendment claims. Finally, we must determine whether Plaintiffs' request for injunctive relief is moot.

### 1. *Fourteenth Amendment*

 Plaintiffs contend that their rights under the Fourteenth Amendment were violated by Defendants because they were not provided with an opportunity to be heard before their pets were taken from them. The Due Process Clause of the Fourteenth Amendment provides that property cannot be deprived except pursuant to constitutionally adequate procedures. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). "[T]o establish a 'procedural due process claim under [§ ] 1983, a plaintiff must allege first that [he] has a property interest as defined by state law and, second, that the defendants, acting under color of state law, deprived [him] of that property interest without [a] constitutionally adequate process.'" *Diaz–Pedrosa v. P.R. Power Auth.,* 555 F.Supp.2d 306, 315 (D.P.R.2008) (internal citations omitted) (alterations in original). The Fourteenth Amendment requires that the deprivation of a property interest "be preceded by notice and opportunity for hear-

ing appropriate to the nature of the case." *Id.* at 542, 105 S.Ct. 1487 (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). The determination of whether someone is entitled to a pre-deprivation hearing is fact-specific, as "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). To determine whether a pre-deprivation hearing was required in this case this Court must consider three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value of additional or substitute procedural safeguards; and (3) the Government's interest. *Id.* at 335, 96 S.Ct. 893. After considering all three factors, this Court finds that Plaintiffs were entitled to a pre-deprivation hearing.

██ First, as discussed in our previous opinion, for purposes of the Fourteenth Amendment, people have a protected property interest over their pets. (Docket No. 91). Second, the manner in which Plaintiffs' pets were removed did not provide any adequate safeguards or protection against an arbitrary and capricious determination. Hence, the risk of an erroneous deprivation was high. Finally, the Defendants' interests would not have been harmed by providing Plaintiffs with a hearing prior to the deprivation of their pets. Consequently, we find that a pre-deprivation hearing was required prior to removing and destroying any pets from the housing complexes.

 We note that the failure to provide a pre-deprivation hearing does not necessarily offend the Fourteenth Amendment if the deprivation was caused by the "random and unauthorized" act of a state

employee. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). This is what is known as the *Hudson–Parratt* doctrine which the First Circuit has repeatedly held applies only where the deprivation complained of is " 'random and unauthorized.' " *O'Neill v. Baker,* 210 F.3d 41, 50 (1st Cir.2000). As the *Hudson* Court reasoned, meaningful post-deprivation state remedies satisfy due process in such circumstances because it is "simply impracticable" for the state to provide predeprivation process where it cannot anticipate when the "random and unauthorized" deprivation will occur. *Hudson v. Palmer,* 468 U.S. at 533, 104 S.Ct. 3194. By contrast, a state may be able to predict the occurrence of deprivations caused by operation of its own pre-existing procedures. *See Parratt,* 451 U.S. at 541, 101 S.Ct. 1908. The availability of post-deprivation remedies does not defeat a § 1983 claim where the alleged loss results from adherence to an established state or municipal policy. *See O'Neill,* 210 F.3d at 50; *Pangburn v. Culbertson,* 200 F.3d 65, 71 (2d Cir.1999). Courts must therefore scrutinize carefully the assertion by state officials that their conduct is "random and unauthorized." *Id.*

In the case at bar, Defendants I do not assert that their conduct was random and unauthorized. Defendants I submit that the removal of Plaintiffs' pets from the housing complexes was done pursuant to the Pet Policy in place. (Docket No. 230 at 8). Plaintiffs, on the other hand, argue that the Pet Policy which Defendants I contend that they acted pursuant to was not in effect. (Docket No. 214–2 at 7 and 8). Plaintiffs submit that the policy in place when their pets were removed allowed pets. *Id.* According to Plaintiffs, Defendants I acted pursuant to Ordinance No. 33, which as mentioned above, was enacted by the Municipality to prohibit pets in the housing complexes. (Docket Nos. 214–2 at 47 ¶ 44; 224–4, Exh. 2 at 7–9; & 244–2, Exh. 4). In support of this fact, Plaintiffs submitted the Mayor's answer to Plaintiffs' interrogatory in which he stated that his actions "were taken pursuant to Ord[i]nance 33, to the duties imposed by the Autonomous Municipal Act, the Contract between the Municipality and the Puerto Rico Public Housing Authority, the lease contract between the residents and the PRPHA, and the Pet Policy promulgated by said agency. (Docket No. 214–78, Exh. 70 at 4). Thus it is contested whether Defendants I acted under Ordinance No. 33, as argued by Plaintiffs, or pursuant to the Pet Policy in place as alleged by Defendants I. It is clear, however, that Defendants are not arguing that the removal of Plaintiffs pets was a random and unauthorized act. Consequently, the *Hudson–Parratt* doctrine cannot apply here.

The record also reflects that Defendants I's notice was not afforded at a meaningful time and in a meaningful manner. Procedural due process requires that the right to notice and an opportunity to be heard "be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (citing *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). From October 5, 2007 until October 7, 2007, the administrators notified the residents of the housing developments that they were not allowed to

have pets. The letter, however, did not indicate whether or when personnel would enter the housing developments to enforce the purported ban on pets. On October 8, 2007, the Mayor, along with employees from both the Municipality and ACS, went into each of the public housing communities in order to execute an operation for the pick up of the pets in possession of public housing residents. This is clearly not enough to meet the "meaningful time" requirement.

In sum, pursuant to the Fourteenth Amendment, a pre-deprivation hearing was required before depriving Plaintiffs of their pets. Defendant I would thus be entitled to summary judgment only on the claims proffered by Plaintiffs who did not lose a pet, as they were not deprived of their property. Defendants I have the burden of demonstrating that it is uncontested that each Plaintiff did not lose a pet.

 It is uncontested that the Twelve Plaintiff Families did not lose their pets. (Docket No. 182, Exh. 10, at 9–10; Exh. 11, at 10; Exh. 12, at 14; Exh. 13, at 9–10; Exh. 14, at 10; Exh. 15, at 12; Exh. 16, at 16–17; Exh. 17, at 11–12; Exh. 18, at 12; Exh. 19, at 18–19; Exh. 20, at 12–13; Exh. 21, at 12–13). Consequently, the Fourteenth Amendment claims proffered by the Twelve Plaintiff Families must be summarily disposed of. All of the other Plaintiffs were deprived of their pets.[3] Hence, the Fourteenth Amendment procedural due process claims proffered by the remaining Plaintiffs will not be dismissed. We now proceed to lay down the legal framework necessary to address whether Plaintiffs' Fourth Amendment claims should be summarily disposed of.

### 2. *Fourth Amendment*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Plaintiffs argue that their rights under the Fourth Amendment were violated because their pets were subject to an unreasonable seizure. Furthermore, they argue that some of their homes were subject to an unreasonable search and seizure by Defendants.

 For purposes of the Fourth Amendment, pets are "effects" and, therefore, protected from unreasonable seizures. *Maldonado v. Fontanes,* 568 F.3d 263, 271 (1st Cir.2009). "The killing of a person's pet dog or cat by the government without the person's consent is [ ] a seizure within the meaning of the Fourth Amendment." *Id.* To be constitutionally valid, however, the "seizure" i.e., the killing of a person's pet must be "reasonable." *Brown v. Muhlenberg Twp.,* 269 F.3d 205, 210 (3d Cir.2001). "The Supreme Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). A warrantless seizure may be reasonable when there is a sufficiently compelling governmental

---

**3.** We note that Defendants I claim that the Four Plaintiff Families I "voluntarily" surrendered their pets. For purposes of claims under the Fourteenth Amendment claims, the state deprivation of a constitutional protected interest in property is not itself unconstitutional; what is unconstitutional is the deprivation of such interest without the due pro-

cess of law. *Zinermon v. Burch,* 494 U.S. 113, 126, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Thus the fact that the Four Plaintiff Families delivered their pets does not entail that they waived any claims under the Fourteenth Amendment for the deprivation of their property without the due process of law.

interest justifying the seizure and the extent of the intrusion occasioned by the seizure is not disproportionate to that interest. *Brown*, 269 F.3d at 210. "Thus, when the state claims a right to make a warrantless seizure, we 'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (citing *Place*, 462 U.S. at 703, 103 S.Ct. 2637). The seizure will be found unreasonable if it is disproportionately intrusive, and the state's interest is sufficiently compelling to justify only a warrantless seizure that is minimally intrusive. *Id.*

The killing of a person's pet constitutes an unconstitutional destruction of property absent a sufficiently compelling public interest. *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir. 2005). Defendants justify the warrantless seizure of Plaintiffs' pets by arguing that the pets were reasonably deemed to be stray or dangerous. The killing of a person's pet does not constitute a Fourth Amendment seizure if it poses an imminent danger such that the state's interest in protecting life and property is implicated. *Brown*, 269 F.3d at 210. In such a case, "the state's interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence." *Id.* at 210–11. The Fourth Amendment, however, does not allow the state to destroy a pet when it poses no immediate danger and the pet is taken from an owner who is desirous of retaining custody. *See id.* at 211.

The state does not violate the Fourth Amendment when it takes pets found at large into custody because the state has an interest in restraining it so that it will pose no danger to the person or property of others. *Id.* at 210. "The dog catcher thus does not violate the Fourth Amendment when he or she takes a stray into custody." *Id.* The state, however, violates the Fourth Amendment if it kills a pet that poses no danger, has wandered outside of its home, and has a known owner desirous of retaining custody. *Id.*

Defendants also argue that they did not transgress the Fourth Amendment because some of the Plaintiffs voluntary relinquished their pets. On the other hand, Plaintiffs submit that they were coerced into relinquishing their pets under the threat of being evicted. If a person relinquishes his property to an official due to coercion by the official, that person does not forfeit his Fourth Amendment right over the property. *See Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir.1994) (finding that a government employee did not waive his Fourth Amendment property rights over his dog when he relinquished the dog pursuant to a direct order from his superior). This Court, nonetheless, recognizes that a warrantless seizure of property does not contravene the Fourth Amendment if the owner consents to the seizure. *United States v. Perez–Montanez*, 202 F.3d 434, 438–39 (1st Cir.2000). Such consent, however, must be freely given and not the product of coercive or intimidating behavior on the part of state officials. *Id.*

Plaintiffs also contend that Defendants violated the Fourth Amendment because some of Plaintiffs' homes were subject to an unreasonable search and seizure. "Warrantless search and seizures in the home violate the Fourth Amendment, absent consent or exigent circumstances."[4]

---

**4.** Generally, this warrant requirement applies to both civil and criminal search and seizures

by the police or some other government offi-

*United States v. Weidul,* 325 F.3d 50, 53 (1st Cir.2003) (internal citation and quotation marks omitted). For a warrantless search of a home to be valid, consent must be voluntary. *Id.* Whether consent is voluntary is to be determined by examining the totality of the circumstances, including the interaction between the state official and the person alleged to have given consent. *Id.* We note that "[w]arrantless entries are most often justified by 'exigent circumstances,' the best examples being hot pursuit of a felon, imminent destruction or removal of evidence, the threatened escape by a suspect, or imminent threat to the life or safety of the public, police officers, or a person in residence." *Bilida,* 211 F.3d at 172.

 Places adjacent to the home, known as "curtilage," have generally been subject to the warrant requirement. *Id.* at 171. To determine whether a particular area falls within the home's curtilage, this Court looks to whether it is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of

cial. *Bilida v. McCleod,* 211 F.3d 166, 171 (1st Cir.2000).

5. Such analysis is guided by four specific criteria: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.* (internal citation omitted).

6. Nevertheless, the Fourth Amendment could be implicated if the "knock and talk" becomes coercive such as when the officers make the people inside feel they have to open up by either asserting their authority, refusing to leave, or otherwise making the people inside feel they cannot refuse to open up. *United States v. Spotted Elk,* 548 F.3d 641, 655 (8th Cir.2008). We note that if a an officer enters the curtilage of a person's home without a warrant and engages in a coercive "knock and talk," such officer could engage

Fourth Amendment protection." *United States v. Brown,* 510 F.3d 57, 65 (1st Cir. 2007) (internal citations omitted).[5] A warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that a legitimate law enforcement objective exists and the intrusion upon one's privacy is limited. *United States v. Weston,* 443 F.3d 661, 667 (8th Cir.2006). For instance, the Fourth Amendment is not violated when state officials enter the curtilage of a home for the legitimate purpose of knocking on the door of a person's home to seek a voluntary conversation. *Id.; see also United States v. Parker,* 549 F.3d 5, 8 (1st Cir.2008); *United States v. Cephas,* 254 F.3d 488, 494 (4th Cir.2001). The Mayor argues that he merely knocked on the doors of Plaintiffs' residences, and engaged in a consensual conversation with the Plaintiffs. This is what is known as a "knock and talk." *Weston,* 443 F.3d at 667. As long as the "knock and talk" is a consensual encounter, the Fourth Amendment is not contravened. *United States v. Cruz–Mendez,* 467 F.3d 1260, 1264 (10th Cir.2006).[6]

in a unconstitutional intrusion into the person's zone of privacy prohibited by the Fourth Amendment. Furthermore, we interestingly note that a nonconsensual "knock and talk" encounter could also be analyzed as an investigatory stop or seizure of the person. *See Fla. v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (holding that a consensual encounter with an officer does not trigger the Fourth Amendment as long as a reasonable person would feel free to disregard the officer and go about his business); *United States v. Fernandes,* 285 Fed.Appx. 119, 123 (5th Cir.2008) (analyzing whether an investigatory stop-seizure was a consensual encounter and, therefore, not in violation of the Fourth Amendment); *United States v. Ray,* 199 F.Supp.2d 1104, 1111 (D.Kan.2002) (finding that a knock and talk is ordinarily consensual unless coercive circumstances such as unreasonable persistence by the officers turns the encounter into an investigatory stop); *United States v. Ponce Munoz,* 150 F.Supp.2d 1125, 1133 (D.Kan.2001) (same).

Plaintiffs bring the present suit under § 1983. It is well settled law that § 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal citations and quotation marks omitted). Under § 1983, a plaintiff must first show that "the conduct complained of was committed by a person acting under color of state law." *Destek Group, Inc. v. State of New Hampshire Public Utilities Commission*, 318 F.3d 32, 39 (1st Cir.2003); *DiMarco–Zappa v. Cabanillas*, 238 F.3d 25, 33 (1st Cir.2001). Secondly, a plaintiff must show the defendant's conduct deprived a person of rights, privileges, or immunities secured by the Constitution of the United States. *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir.1989). "To satisfy the second element, plaintiffs must show that the defendants' conduct was the cause in fact of the alleged deprivation." *Rodriguez–Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir.1997). Defendants argue that the second prong is not satisfied here because their conduct did not violate Plaintiffs' rights under the Fourth Amendment. Accordingly, this Court must individually address whether Defendants are each entitled to summary judgment because their conduct did not affect Plaintiffs' constitutional rights under the Fourth Amendment.

First, the Twelve Plaintiff Families' claims under the Fourth Amendment must be examined. Since the Twelve Plaintiff Families did not lose a pet they did not suffer a Fourth Amendment sei-zure. Furthermore, they were not subject to a warrantless search of their homes. (*See* Docket No. 182, Exh. 10, at 9–10; Exh. 11, at 10; Exh. 12, at 14; Exh. 13, at 9–10; Exh. 14, at 10; Exh. 15, at 12; Exh. 16, at 16–17; Exh. 17, at 11–12; Exh. 18, at 12; Exh. 19, at 18; Exh. 20, at 12–13; Exh. 21, at 12–13).[7] Accordingly, the Twelve Plaintiff Families' claims under the Fourth Amendment must be dismissed.[8]

## A. *The Mayor*

Defendants I move to dismiss Plaintiffs' personal capacity claims against the Mayor under the Fourth Amendment. In their objections, Defendants I aver that the Mayor's actions did not go against the Fourth Amendment. Defendants I submit that the Mayor's actions were limited to knocking on the doors of Plaintiffs' residences and asking whether they voluntarily wished to deliver their pet to the Municipality. In support of this fact, Defendants I submitted the deposition of one of the Plaintiffs, Mariyunaira Rivera, who stated that her interaction with the Mayor was limited to a short conversation after the Mayor knocked on her door. Namely, the Mayor together with other individuals asked Mariyunaira Rivera if she had any pets, which she negated, even though she had pet cats. Immediately thereafter, the Mayor and the other individuals left. Mariyunaira Rivera's cats were never taken by Defendants. (Docket No. 182, Exh. 16 at 16–17). We find that the Mayor's interaction with Plaintiff Mariyunaira Rivera was a "knock and talk" that does not violate the Fourth Amendment. Mariyunaira Rivera and her child Victor Manuel is one of the Twelve Plaintiff Families whose federal claims have already been dismissed.

---

7. *See* also Docket No. 214–2, at 51–52, 57–58, 64–67, 72–82, 84–85.

8. Since all federal claims against the Twelve Plaintiff Families will be dismissed, this Court need not address Defendants I's argument that the Twelve Plaintiff Families lack standing to bring their claims.

■ Moreover, to support the Mayor's "knock and talk" argument, Defendants I point to the deposition testimony of Plaintiff Jessica Fuentes and Antonia Morales. The Mayor states that both of the Plaintiffs claim that a Defendant entered their home. Jessica Fuentes makes no mention of the Mayor when describing how her home was entered. (Docket No. 182, Exh. 23 at 29). The Mayor essentially requests that because Jessica Fuentes made no mention of him, we must infer that his actions as to her were limited to a "knock and talk." At summary judgment, however, inferences are made in the non-movant's favor. *Vineberg,* 548 F.3d at 56. Likewise, the Mayor implies the same averment by submitting the deposition testimony of Antonia Morales which makes no mention of him. (Docket No. 182, Exh. 28). The Mayor does not point to other evidence that supports that he only knocked on the doors of the other Plaintiffs and engaged in consensual conversations with them. Moreover, this Court is not required to "ferret through the record" in search of facts that may favor the parties. *Morales v. Orssleff's EFTF,* 246 F.3d 32, 33 (1st Cir.2001). The Mayor seems to argue that we must infer that he acted with each Plaintiff in the same manner that he did with Mariyunaira Rivera, which this Court cannot do. Plaintiffs on the other hand submitted evidence that the Mayor seized pets. (Docket No. 214 at 29 & Docket No. 214–2 at 46–47, ¶¶ 40–41).

■ After drawing all inferences in Plaintiffs' favor, we find that a trial-worthy issue exists whether the acts of the Mayor as to the other Plaintiffs were limited to "knock and talks." Based on the uncontested fact that some of the pets were thrown from a bridge to their death, we further hold that there is a trial worthy issue whether the pets taken were subject to an unreasonable seizure in violation of the Fourth Amendment. Since Defendants I have failed to show that it is uncontested that the Mayor limited his actions to a "knock and ask," with respect to the other Plaintiffs, the Mayor is not entitled to summary judgment on such grounds.[9] The Mayor could have only avoided this conclusion by pointing this Court to evidence that his specific encounter with each of the Plaintiffs was limited to a "knock and talk." The Mayor fulfilled this burden only as to Mariyunaira Rivera and her child Victor Manuel.

■ Defendants I also grounded their objection to the Magistrate Judge's decision to deny the Mayor qualified immunity on their allegation that the Mayor only engaged in "knock and talks." Qualified immunity is a judge-made doctrine that allows public officials to perform discretionary tasks in the public sector without the constant threat of legal liability in their personal capacity. *Pagan v. Calderon,* 448 F.3d 16, 31 (1st Cir.2006); *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 705 (1st Cir.1993).[10] When qualified

9. Defendants I further argued that Plaintiffs' Fourth Amendment rights were not violated because the Mayor's conversations with Plaintiffs were consensual. This Court need not discuss this argument because Defendants I have failed to show for purposes of summary judgment that the Mayor's actions were limited to knock and talks.

10. "The Supreme Court's most recent rulings on qualified immunity provide clarification on several points and require some revision of

the nomenclature and steps this circuit has previously used." *Maldonado,* 568 F.3d at 268. "In *Pearson v. Callahan,* — U.S. —, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Court reiterated that the qualified immunity inquiry is a two-part test." *Id.* at 268–269. "A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged

immunity has been raised at the summary judgment stage, the Court must look at the record, particularly with respect to a defendant's acts, and determine whether a genuine issue does or does not exist concerning qualified immunity. *Aldarondo–Lugo v. Santiago–Diaz*, 329 F.Supp.2d 234, 237 (D.P.R.2004) (internal citation omitted). Here, there is a genuine issue of a material fact that precludes the Mayor's request for qualified immunity. Specifically, Defendants I have failed to show that there is no genuine issue as to the fact that the Mayor only engaged in "knock and talks" with the remaining Plaintiffs.

**B.** *The Municipality*

 The Municipality argues that it cannot be found liable under the Fourth Amendment because the violations alleged by Plaintiffs were not the result of its official policy. The Municipality is correct in that it can only be held liable under § 1983 for constitutional violations only if they occur pursuant to an official policy or custom. *Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir.2008) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Here, whether the Municipality acted pursuant to an official policy or custom is in dispute. As discussed above, there is a genuine issue whether the Municipality acted pursuant to Ordinance No. 33. Consequently,

this Court cannot grant the Municipality's request for summary judgment on the grounds that the alleged violations did not occur pursuant to its official policy.

Defendants I further argue that the Municipality's actions should be deemed reasonable, and not in violation of the Fourth Amendment because there were a large amount of strays in the housing complexes. Basically, the Municipality avers that those Plaintiffs whose pets were seized outside of their homes, in the public spaces of the housing complexes, did not suffer a Fourth Amendment violation because their pets were reasonably deemed to be strays. The Municipality cannot be found liable under the Fourth Amendment when it takes animals found at large into custody because it has an interest in restraining them so that they will pose no danger to the person or property of others. The Municipality, however, does go against the Fourth Amendment when it takes and destroys a pet that poses no danger and has wandered outside of its home, if it has a known owner.

It is uncontested that there was a large number of strays in the housing complexes. (Docket No. 182, Exh. 4 & Exh. 22 at 16–17). Defendants I, nonetheless, fail to submit evidence that the Four Plaintiff Families II, who are the only Plaintiffs

violation." *Id.* at 269 (citing *Pearson,* 129 S.Ct. at 815–16).

"It is clear from the Supreme Court's description of the second, 'clearly established' step of the qualified immunity analysis that the second step, in turn, has two aspects." *Id.* One aspect focuses on "the clarity of the law at the time of the alleged civil rights violation." *Id.* "[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Pearson,* 129 S.Ct. at 822. If judges disagree on a constitutional question or there is a "divergence of views", such as in the case of a Circuit split, "it is unfair to

subject police to money damages for picking the losing side of the controversy." *Id.* at 823.

The other aspect focuses on "the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Maldonado,* 568 F.3d at 269. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 129 S.Ct. at 815.

that according to Defendants had their pets at large in the housing complexes, had pets that were reasonably deemed to be strays. Kortright's pet dog ran outside as the animals were being collected. (Docket No. 214–56, Exh. 48 at 14). Kortright's dog was taken despite her request to give the dog back. *Id.*

Kortright's dog was an American Stafford Terrier. (Docket No. 182, Exh. 27 at 22). According to Defendants I, the taking of Kortright's dog was reasonable because an American Stafford Terrier is a Pit Bull, which is a dangerous breed with an exceptional strong jaw. Defendants, however, fail to show that the dog posed any immediate danger. The Fourth Amendment does not allow the Municipality to destroy a pet when it poses no immediate danger and the dog is taken from an owner who is desirous of retaining custody. We note that in *Brown*, the court held that a police officer committed an unreasonable seizure within the meaning of the Fourth Amendment when it killed a pet Rottweiler, a large dog with a strong jaw, that posed no immediate danger, and had wandered to a public area, and whose owners were known, available, and desirous of assuming custody. *Brown*, 269 F.3d at 209–12. Likewise, we find that Defendants I are not entitled to summarily dispose of Kortright's claims because they have not shown that her dog posed an immediate danger.

The Jimenez Household's pet was also taken in the presence of its owners as it just had left its home. The Jimenez Household's pet had wandered outside its home and was picked up in front of the house of Jeniffer Jimenez' mother, who lives two houses down from the Jimenez Household's residence. (Docket No. 214–52, Exh. 43 at 9–10). The Jimenez Household was even told that the dog would be taken to the shelter. *Id.* The Jimenez

Household's pet could not reasonably deemed to be a stray as it had a known owner. The fact that the Jimenez Household's pet was outside of its home when it was picked up does not entitle Defendants to summary judgment because, as discussed above, the Fourth Amendment does not allow the Municipality to take and destroy a pet that has wandered outside of its home when it poses no immediate danger, and the dog is taken from an owner who is known and desirous of retaining custody. Likewise, the Rivera Household and the Morales Household's pet were taken from their known owners. The Morales Household's pet was taken while it was next to Antonia Morales's son. (Docket No. 214–42, Exh. 31 at 15). The dog whose name is "Peludo" was grabbed and hit. *Id.* The hit made Peludo bleed and drop to the ground. *Id.* Thereafter, the dog was taken. *Id.* The Rivera Household's pet was taken in front of Maribel Rivera's boyfriend, who requested that the dog be returned. (Docket No. 214–54, Exh. 46 at 11).

In sum, this Court finds without merit Defendants I's claim that the Municipality cannot be held liable because the animals taken could reasonably deemed to be strays that posed a danger to life and property. As such, the Four Plaintiff Families II's claims will not be dismissed.

### C. *The Four Plaintiff Families I*

 Defendants argue that the Four Plaintiff Families I did not suffer a Fourth Amendment violation because they voluntarily delivered their pets. We disagree. The Four Plaintiff Families I delivered their pets after they were threatened with having their lease contract cancelled and being evicted from their houses. (Docket Nos. 182, Exh. 22 at 9; 214–79, Exh. 71 at 12; 214–61, Exh. 53 at 10 & 214–40, Exh. 29 at 14–15). After having all reasonable

inferences made in the Four Plaintiff Families I's favor, this Court finds for purposes of summary judgment that the Four Plaintiff I were coerced into giving their dogs to Defendants. As such, this Court cannot summarily dispose of the Four Plaintiff Families I's claims on the basis that they consented to the seizure of their pets.

### D. *The Seven Plaintiff Families*

 Defendants also move to dismiss the Seven Plaintiff Families' Fourth Amendment claims. Defendants allege that the Seven Plaintiff Families' pets were taken from the balconies of their residences. Defendants aver that the balconies of the Seven Plaintiff Families' apartment were mere cement slabs that could not be considered part of the curtilage of their homes. According to Defendants, the Seven Plaintiff Families had no privacy interest over their balconies and, as such, cannot claim to have suffered a Fourth Amendment violation because their pets were taken from that area.

This Court need not decide whether the balconies of the Seven Plaintiff Families were part of the curtilage of their homes. It is uncontested that the Seven Plaintiff Families' pets were seized, as they were taken and destroyed. Defendants have not submitted any evidence that the Seven Plaintiffs consented to the seizure; that their pets were strays; or that their pets posed an immediate danger to life and property. Hence, the seizure of their pets is deemed unreasonable for purposes of this motion. As a result, the Seven Plaintiff Families' claims cannot be dismissed. This Court must now address Defendants II's objection to the Magistrate Judge's recommendation to deny their motion for summary judgment. Defendants II argue that the claims proffered against them in their official and personal capacity should be dismissed.

### E. *Ruiz*

Ruiz is the Director of Federal Programs at the Municipality. (Docket No. 194 at 1). Ruiz drafted the letter sent to all residents warning them that they would be evicted should they oppose the removal of pets. (Docket No. 194 at 2). Ruiz was warned that the Pet Policy in place allowed residents to have pets. (Docket No. 224-5, Exh. 3 at 14). Furthermore, Ruiz was warned that the pet policy, which did not allow pets, was a draft that expired in 2002. (Docket No. 224-4, Exh. 2 at 8). Ruiz, nonetheless, believed that pursuant to Ordinance No. 33, the residents in the housing projects could not have pets and, therefore, could be required to hand over their pets or face eviction. (Docket No. 224-4, Exh. 2 at 7-9). Ruiz was present at one of the housing complexes while Plaintiffs' pets were being removed. (Docket No. 224-3, Exh. 1 at 39-40).

Defendants II argue that Ruiz cannot be held liable under the Fourth Amendment because Ruiz never entered any of Plaintiffs' residences. Plaintiffs, on the other, hand argue that Ruiz, as Director of Federal Programs at the Municipality, was involved in the decision making process to go into the housing complexes to remove Plaintiffs' pets. Plaintiffs stress that despite being warned that the pet policy in place allowed pets, Ruiz proceed to plan and take part in the taking of their pets pursuant to Ordinance No. 33.

 Like municipal liability, supervisory liability cannot be predicated on a *respondeat superior* theory. *Barreto–Rivera v. Medina–Vargas*, 168 F.3d 42, 48 (1st Cir.1999). Supervisors may only be held liable under § 1983 on the basis of their own acts or omissions. *Id.* Supervisory liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct

that amounts to condonation or tacit authorization. *See Camilo–Robles v. Zapata,* 175 F.3d 41, 44 (1st Cir.1999).

For purposes of liability pursuant to § 1983, a supervisor is defined loosely to encompass a wide range of officials who are themselves removed from the perpetration of the rights-violating behavior. *Camilo–Robles v. Hoyos,* 151 F.3d 1, 6–7 (1st Cir.1998). Basically, a supervisor can be held liable under § 1983 if she formulates a policy or engages in a practice that leads to a civil rights violation committed by another. *Id.* at 7. Absent direct participation, a supervisor may be held liable under § 1983 in either his official or personal capacity for the behavior of his subordinates if both: (1) the behavior of her subordinates results in a constitutional violation and (2) the supervisor's action or inaction was affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference. *Whitfield v. Melendez–Rivera,* 431 F.3d 1, 14 (1st Cir.2005) (internal citation and quotation marks omitted); *Rodriguez–Oquendo v. Toledo–Davila,* 39 F.Supp.2d 127, 134 (D.P.R.1999). A "plaintiff in a personal-capacity suit need not establish a connection to governmental policy or custom." *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).[11]

This Court holds that Plaintiffs have submitted sufficient evidence to create a trial worthy issue whether Ruiz as a supervisor formulated the policy that led to Plaintiffs' pets being seized and killed. Plaintiffs submitted evidence in support of the fact that Ruiz, as the Director of the Federal Programs at the Municipality, was the author of the letter and did nothing to stop the taking of Plaintiffs' pets despite being warned that the pet policy in place allowed pets. This leads us to find that whether Ruiz encouraged the unlawful seizure of Plaintiffs' pets is an issue that should proceed to trial.

### F. *Molina*

Molina is the Director of Emergency Management for the Municipality. (Docket No. 194 at 2). Molina went into one of the housing complexes on October 8, 2007 to execute the operation for the pick up of Plaintiffs' pets. (Docket No. 240–3, Exh. 10 at 2). Molina collaborated in directing the entire operation. (Docket No. 224–10, Exh. 8 at 36). Furthermore, Molina coordinated the pickup of Plaintiffs' pets, knocked on Plaintiffs' doors, and told them that they would be evicted if they did not surrender pets. (Docket No. 224–15, Exh. 13 at 19 & Docket No. 240–2, Exh. 9 at 2). These facts are sufficient to create a genuine issue whether Molina as a supervisor encouraged the unlawful seizure of Plaintiffs' pets. Furthermore, the evidence submitted by Plaintiffs has created a

11. Generally, official-capacity suits represent another way of pleading an action against an entity of which an officer is an agent. *Id.* (internal citation and quotation marks omitted). Thus suits against state officials in their official capacity must be treated as suits against the State. *Id.* (internal citation omitted). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's 'policy or custom' must have played a part in the violation of federal law.'" *Id.* (internal citation omitted). "Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." *Id.* Accordingly, to establish personal liability in a § 1983 action, a plaintiff need not establish a connection to governmental "policy or custom," as it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *Id.* (internal citation omitted).

trial worthy issue whether Molina directly participated in the unlawful seizure of Plaintiffs' pets. Specifically, Plaintiffs submitted evidence that Molina not only knocked and talked to Plaintiffs but also coordinated the pick up of their dogs. Hence, Plaintiffs have shown that a trial worthy issue exist whether Molina is liable as a supervisor for encouraging the unlawful constitutional conduct complained of by Plaintiffs and for his direct participation in such violations.

### G. *Gonzalez*

 was the administrator of one of the housing complexes where Plaintiffs live. (Docket No. 194 at 4). Gonzalez was present while Plaintiffs' pets were taken from their residences. (Docket No. 224–28, Exh. 26 at 25–27, 36). During the operation, Gonzalez accompanied the employees of the Municipality among them Molina. (*Id.*).

Defendants II contend that summary judgment should be entered in Gonzalez's favor because she did not enter any of Plaintiffs' residences, threaten any of the Plaintiffs nor removed their pets. Plaintiffs oppose Defendants II's request for summary judgment and argue that those Defendants that entered and grabbed Plaintiffs' pets did so under the supervision of Gonzalez and Molina. Making all reasonable inferences in Plaintiffs' favor leads us to conclude that whether Gonzalez was a supervisor that encouraged, condoned, acquiesced or acted with gross negligence amounting to deliberate indifference is in genuine dispute. Accordingly, Plaintiffs' claims against Gonzalez must also proceed to trial.

### H. *Riquelme*

Riquelme was also the administrator of one of the housing complexes where Plaintiffs lived. (Docket No. 194 at 4). Ri-quelme was present when the Plaintiffs' pets were taken and even ordered one of the Plaintiffs to turn in their pet. (Docket No. 224–19, Exh. 17 at 14–15). Defendants II contend that summary judgment should be entered in Riquelme's favor because she did not enter any of Plaintiffs' residences. Plaintiffs oppose such request. As in the case of Gonzalez, we find that after making all reasonable inferences in Plaintiffs' favor, there is a genuine dispute whether Gonzalez was a supervisor that encouraged, condoned, acquiesced, or acted with gross negligence amounting to deliberate indifference in violation of Plaintiffs' rights.

### I. *Santiago*

 Santiago actively participated in the removal of Plaintiffs' pets. (*See* Docket Nos. 224–18, Exh. 16 at 12; 224–14, Exh. 12; 214–56, Exh. 48 at 14). Defendants II have not submitted any evidence that Santiago did not remove their pets. Defendants did argue that Jessica Fuentes consented to the removal of her pet. That material fact, however, is in dispute, as Plaintiffs submitted evidence that Jessica Fuentes never consented to the removal of her pet. (Docket No. 224–18, Exh. 16 at 28). Since there is no other evidence submitted by Defendants II that would entitle Santiago to summary judgment on Plaintiffs' Fourth Amendment claims, this Court must deny Santiago's request for summary judgment.

### J. *Supplemental Law Claims*

 This Court should decline to exercise supplemental jurisdiction over a plaintiff's supplemental jurisdiction claims when all federal claims are dismissed. *See Camelio v. American Federation,* 137 F.3d 666, 672 (1st Cir.1998) (holding that "the balance of competing factors ordinarily will weigh strongly in favor of declining juris-

diction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation") (internal citations omitted). All federal claims proffered by the Twelve Plaintiff Families shall be dismissed. As such, all state law claims submitted by the Twelve Plaintiff Families must be dismissed.[12] All other supplemental state law claims shall proceed to trial.

### K. *Injunction*

In the case at bar, Plaintiffs request that Defendants be permanently enjoined from repeating their actions, i.e. the taking and killing of pets in the housing complexes. The Magistrate Judge recommended the denial of Plaintiffs' request for injunctive relief. Plaintiffs object to the Magistrate Judge's conclusion that their request for injunctive relief is moot.

■■■ It is settled law that in a federal court, justiciability requires the existence of an actual case or controversy. *Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 48 (1st Cir.2006). The "case and controversy" requirement persists at all stages of the litigation. *Id.* Accordingly when events take place that make it impossible for the court to provide effective relief, the matter is no longer justiciable and must therefore be dismissed as moot. *Id.* (internal citation omitted); *Oakville Dev. Corp. v. Federal Deposit Ins. Corp.*, 986 F.2d 611, 613 (1st Cir.1993). A federal court may not grant injunctive relief when "intervening events have eliminated any reasonable anticipation that the aggrieved party will, in the future, be faced with a recurrence of the alleged harm." *Goodwin*, 436 F.3d at 49 (internal citations omitted).

Defendants argue that Plaintiffs' request for injunctive relief is moot because the Municipality no longer administers the housing complexes. Plaintiffs on the other hand submit that Ordinance No. 33, which contains a categorical prohibition of pets in public housing communities in the Municipality, is still in effect. According to Plaintiffs, the fact that Ordinance No. 33 can be enforced makes Defendants' actions "capable of repetition, yet evading review."

■■■ Plaintiffs' asseveration that the Defendants' actions are "capable of repetition, yet evading review" fastens upon a recognized exception to general principles of mootness. *Id.* at 615. "[T]he exception applies only if there is a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *Id.* (internal citations and quotation marks omitted). Plaintiffs' case does not fall within this exception.

First, the fact that the Municipality no longer administers the housing complexes is an intervening event that eliminates any reasonable anticipation that in the future, the Municipality will, as alleged by Plaintiffs, mobilize the other Defendants to commit the harms alleged in the case at bar. Second, the Municipality is aware that the 2007 Pet Policy allows public housing residents to have pets. We find it highly unlikely that the Municipality would repeat the actions that occurred in October 2007. More than two years have passed since the events complained of by Plaintiffs took place. Plaintiffs have not submitted any claims in those two years that deal with Defendants engaging again in the taking of pets from the residents of the

---

12. The fact that the Twelve Plaintiff Families' state law claims have been dismissed does not mean that they have not suffered any damages as a result of Defendants' actions. Whether the Twelve Plaintiff Families suffered damages under state law should be decided by the state courts.

public housing complexes in Barceloneta. Consequently, this Court holds that Plaintiffs have failed to show that they will suffer this fate anew. Accordingly, Plaintiffs' request for a permanent injunction is denied as moot.

**CONCLUSION**

For the reasons stated above, the Court hereby **ADOPTS** in part and **REJECTS** in part the Magistrate Judge's Report and Recommendation. (Docket No. 262). Defendants I's motion for summary judgment, (Docket No. 182), is **GRANTED** in part and **DENIED** in part. Defendants II's motion, (Docket No. 197), is **DENIED**. The Twelve Plaintiff Families' federal claims shall be dismissed with prejudice. The Twelve Plaintiff Families' state law claims shall be dismissed without prejudice. All other supplemental state law claims shall proceed to trial. Partial Judgment shall be entered accordingly. Furthermore, the Court denies Plaintiffs' request for injunctive relief.

IT IS SO ORDERED.

*MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION*

JUSTO ARENAS, United States Chief Magistrate Judge.

This matter is before the court on motions for summary judgment filed by defendants, Mayor Luis Fontanés and the Municipality of Barceloneta on May 29, 2009, and by co-defendants Leonides González, Sylavia Riquelme, Esther Ruiz, Ahmid Molina Morales and Edgardo Santiago on June 5, 2009. (Docket Nos. 182 & 197.) Plaintiffs opposed both of the defendants' motions on June 23 and 30, 2009. (Docket Nos. 214 & 224.) On July 1 and 17, 2009, the defendants filed their respective briefs in reply to plaintiffs' opposition to the motion for summary judgment. (Docket Nos.

230 & 243.) The matter was referred to me for report and recommendation on July 17, 2009. (Docket No. 242.) Having considered the arguments of the parties, the evidence presented and for the reasons set forth below, I recommend that the defendants' motions be GRANTED in part and DENIED in part.

**I. FACTUAL BACKGROUND**

All of the plaintiffs' households are located at three public housing developments located in Barceloneta. (Docket No. 182–2, at 1, ¶ 1 & Docket No. 214–2, at 1–2, ¶ 1.) Of the 85 individual plaintiffs, 56 are minor children. (Docket No. 182–2, at 1, ¶ 2 & Docket No. 214–2, at 2, ¶ 2.) All of the adult plaintiffs voluntarily entered into a lease with the responsible public housing authority. (Docket No. 182–2, at 1, ¶ 3 & Docket No. 214–2, at 2, ¶ 3.) The leases stated that the tenants agreed to abide by the Admission and Continued Occupancy Policies of the Public Housing Authority ("PHA"). (Docket No. 182–2, at 1, ¶ 4 & Docket No. 214–2, at 2, ¶ 4.)

On October 1, 1999, the United States Congress approved 42 U.S.C.A. § 1437z–3, a public health and welfare law that allowed public housing residents to own and have in their dwelling one or more household pets. (Docket No. 214–2, at 38, ¶ 1 & Docket No. 230–2, at 3, ¶ 4.) Title 24 C.F.R. § 960.707 allows a public housing resident to own one or more common household pet or have one or more household pet present in the dwelling of such resident subject to reasonable requirements of PHA. (Docket No. 214–2, at 38, ¶ 2 & Docket No. 230–2, at 3, ¶ 4.) In year 2000, the Municipality of Barceloneta passed Ordinance No. 33 which did not allow residents to have pets in urbanizations, the town center and in housing developments. (Docket No. 214–2, at 38, ¶ 3 & Docket No. 230–2, at 3, ¶ 4.)

From 2003 to 2006, the Puerto Rico Public Housing Authority ("PRPHA") submitted to the United States Department and Housing Development ("HUD") an Annual Plan and their Five Year Plan which contained the policies under which they work. (Docket No. 214–2, at 39, ¶ 4 & Docket No. 230–2, at 3, ¶ 4.) The Annual Plan is the document that the PHA submits to HUD under 24 C.F.R. § 903.4. (Docket No. 214–2, at 39, ¶ 5 & Docket No. 230–2, at 3, ¶ 4.) The 2007 Annual Plan and the Five Year Plan was approved by HUD on June 25, 2007, and in effect as of July 1, 2007. (Docket No. 214–2, at 39, ¶ 6 & Docket No. 230–2, at 3, ¶ 5.) In 2007, PRPHA approved a pet policy consistent with the federal laws and regulations that allowed public housing residents to have pets. (Docket No. 214–2, at 39, ¶ 7 & Docket No. 230–2, at 3, ¶ 5.) PRPHA's policy provided that "[p]et ownership shall be limited to common household pets, which shall be defined to include only dogs, cats, caged birds, commonly kept as pets, tropical fish, frogs, iguanas and turtles kept in aquariums, other small caged animals, and no other species of animal; the pets must be registered with PRPHA or Management Agents." (Docket No. 214–13, at 5, ¶ C.) In September 2007, the PRPHA provided training to the municipalities, including Barceloneta, on the management of public housing under federal laws and regulations. (Docket No. 214–2, at 39, ¶ 9 & Docket No. 230–2, at 4, ¶ 3.)

On October 1, 2007, the Municipality of Barceloneta began as Management Agent of the three public housing complexes. (Docket No. 214–2, at 44, ¶ 24 & Docket No. 230–2, at 5, ¶ 5.) In doing so, the Municipality of Barceloneta had agreed to comply with the PRPHA formally adopted policies for grievance procedures and hearings (formal or informal) and any other required procedure in compliance with 24 C.F.R. part 966, subpart B and any other federal or state regulation. (Docket No. 214–2, at 40, ¶ 11; Docket No. 214–16, at 11–12, ¶ 8.4 & Docket No. 230–2, at 4, ¶ 4.) On October 2, 2007 the Municipality of Barceloneta through the administrators of each public housing development drafted a letter notifying residents of the public housing developments that they could not have pets in the apartments and that their lease contracts could be canceled if they did not comply with the prohibition. (Docket No. 214–2, at 44, ¶ 25; Docket No. 214–31 & Docket No. 230–2, at 5, ¶ 5.) The letter was signed by the administrators on October 3, 2007. (Docket No. 214–2, at 44, ¶ 26; Docket No. 214–31 & Docket No. 230–2, at 6, ¶ 2.)

On October 5, 2007, the Municipality of Barceloneta issued a purchase order to Animal Control Services ("ACS") to collect up to 50 animals. (Docket No. 214–2, at 44, ¶ 28 & Docket No. 230–2, at 6, ¶ 4.) From that same day until October 7, the administrators personally delivered the letter to the residents. The letter, however, did not state that an incursion into the housing developments had been scheduled for any date in particular. (Docket No. 214–2, at 44, ¶ 27 & Docket No. 230–2, at 6, ¶ 3.) On October 8, 2007, the Mayor Luis Fontanés along with employees from both the Municipality of Barceloneta and ACS went into each of the public housing communities in order to execute an operation for the pick up of the pets in possession of public housing residents. (Docket No. 214–2, at 45, ¶ 31; Docket No. 230, at 7, ¶ 1 & Docket No. 239–3.) Municipal employees asked residents whether they had any pets that needed to be turned over. (Docket No. 239–2, at 2, ¶ 3.) About 50 to 80 pets were seized from the public housing complexes. (Docket No. 214–24.) The animals were injected with a yellowish-green color liquid, and some became dazed while others did not move. (Docket No.

239–4, at 2, ¶ 1.) Also, some of the dogs picked up were thrown from a bridge. The Municipality of Barceloneta acted pursuant to Ordinance No. 33, the contract signed with PRPHA, the lease contract between the residents and the PRPHA, and the pet policy promulgated by said agency. (Docket No. 214–78, at 4, ¶ 1.)

On October 17, 2007, the Municipality of Barceloneta fully resigned its administrative duties to operate the public housing developments. (Docket No. 182–2, at 8, ¶ 45 & Docket No. 214–2, at 37, ¶ 45.) Since October 17, 2007 the public housing facilities have not been administered by the Municipality of Barceloneta. (Docket No. 182–2, at 9, ¶ 46 & Docket No. 214–2, at 38, ¶ 46.)

## II. PROCEDURAL BACKGROUND

On October 19, 2007, plaintiffs filed a complaint against various defendants including the Municipality of Barceloneta, Mayor Sol Luis Fontanés, Leonides González, Sylvia Riquelme, Esther Ruiz, Ahmid Molina Morales and Edgardo Santiago. (Docket No. 1.) Plaintiffs invoke the court's jurisdiction pursuant to 42 U.S.C. §§ 1331 and 1983. (Docket No. 1, at 6, ¶¶ 2.1 & 2.2.) Plaintiffs claim that the defendants did not provide them with pre-deprivation remedies prior to the confiscation of their pets nor with post-deprivation remedies, therefore constituting a violation of their property rights secured under the Fourteenth Amendment. (Id. at 31, ¶¶ 6.4 & 7.4.) Also, plaintiffs request declaratory judgment arguing that the defendants' actions constituted a taking. (Id. at 32, ¶¶ 8.2 & 8.3), and that the defendants violated their Fourth Amendment rights since they penetrated their homes and seized their pets without a warrant. (Id. at 32, ¶ 9.2.) In addition, plaintiffs claim that pursuant to 28 U.S.C. § 1367 the court has supplemental jurisdiction to hear and decide their causes of actions based on alleged violations to sections one, four, seven, eight and ten of the Puerto Rico Constitution. (Id. at 6–7, ¶ 2.3 and at 34–37, ¶¶ 11.3, 12.3, 13.3, 14.3 & 15.3.)

On December 19, 2007, plaintiffs filed an amended complaint in which they alleged that the defendants also violated articles 1802 and 1803 of the Civil Code of Puerto Rico (Docket No. 4, at 56, ¶ 12.2) as well as the Commonwealth's Public Policy against acts of cruelty in general pursuant to P.R. Laws Ann. tit. 5, § 1652. (Id. at 56, ¶ 12.5.) Plaintiffs specifically claim that the defendants violated their substantive and procedural due process rights guaranteed by the Fourteenth Amendment and the Laws of the Commonwealth of Puerto Rico. (Id. at 8, ¶ 1.12.) On March 10, 2008 a second amended complaint was filed by plaintiffs. (Docket No. 36.) In addition to all of the claims that were made against the defendants, plaintiffs allege that the defendants also violated their rights under the Fifth Amendment. (Id. 36, at 8, ¶ 1.12.) Among other things, plaintiffs also seek compensatory damages, punitive damages, pre-judgment and post judgment interests, costs, attorneys fees and a permanent injunction. (Id. at 59–60.)

On April 29, 2008, the defendants Mayor Luis Fontanés and the Municipality of Barceloneta moved to dismiss plaintiffs' federal claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket No. 61.) The defendants argue that plaintiffs' claims had to be dismissed because the mayor was entitled to qualified immunity since he did not violate a clearly established constitutional right, and because plaintiffs did not allege or assert that any policy of the Municipality of Barceloneta caused a constitutional violation and therefore they did not have a claim against them. (Docket No. 61, at 2, ¶¶ 2 & 4.) On July 29, 2008, the court

entered an Opinion and Order granting in part and denying in part the defendants' motion to dismiss. (Docket No. 91.) The court denied the mayor's qualified immunity defense as to the plaintiffs' Fourth Amendment and Fourteenth Amendment procedural and substantive due process claims. The court also dismissed plaintiffs' Fifth Amendment and 42 U.S.C. § 1985(3) claims against these defendants. (*Id.* at 9–27.) On August 25, 2008, the defendants filed a motion for a certificate of appealability and a notice of appeal before the United States Court of Appeals for the First Circuit. (Docket Nos. 101 & 102.) On September 3, 2008, the defendants filed a motion to stay the proceedings in the district court pending the outcome of their appeal before the First Circuit. (Docket No. 106.) On September 8, 2008, both of defendants' motions were denied by this court. (Docket Nos. 112 & 113.) On April 8, 2009, the defendants appeal was heard. *See Maldonado v. Fontanés,* 568 F.3d 263 (1st Cir.2009).

On May 29, 2009, defendants Mayor Luis Fontanés and the Municipality of Barceloneta filed a motion for summary judgment. (Docket No. 182.) In essence, they argue that plaintiffs' complaint has to be dismissed because: (1) they did not intrude upon any interest protected by the Fourth Amendment, and even if so the intrusions were not invasive but administrative in nature; (2) even if plaintiffs prove a violation of a right protected by the Fourth Amendment, the plaintiffs have not provided any basis to support a claim that a clearly established right was violated; (3) plaintiffs have not provided any facts supporting a violation of the substantive due process guarantees of the Fourteenth Amendment; (4) there was no policy in effect that resulted in or compelled the violation of any constitutional right; (5) the availability of state law remedies and the lack of violation of any federal right prevent plaintiffs from maintaining their procedural due process claims; (6) plaintiffs' claim for an injunction is moot. (Docket No. 182–3, at 32–33, 35, 37 & 39.)

On June 4, 2009, the United States Courts of Appeals for the First Circuit affirmed this court's order denying the mayor's qualified immunity request on the Fourth Amendment and Fourteenth Amendment procedural due process claims. However, the Court of Appeals reversed this court's decision denying the mayor's qualified immunity request as to plaintiffs' Fourteenth Amendment substantive due process claims. *See Maldonado v. Fontanés,* 568 F.3d at 275. On that same day, co-defendants Leonides González, Sylvia Riquelme, Esther Ruiz, Ahmid Molina Morales and Edgardo Santiago filed a motion submitting their own statement of uncontested material facts, requesting to join the mayor and the municipality's statement of uncontested material facts. (Docket No. 194.)

On June 5, 2009, the court granted the request. (Docket No. 196.) After the co-defendants were allowed to join the mayor and the municipality's statement of uncontested fact, they filed a motion for summary judgment and a memorandum of law in support seeking dismissal of all of plaintiffs' claim. (Docket No. 197.) In their motion the co-defendants argue that: (1) plaintiffs Fourth Amendment claim against them fails because they did not enter any of the housing units; (2) their actions did not violate plaintiffs' Fourth Amendment rights because they were invited into the housing units and/or consent was given; (3) plaintiffs have not presented a cognizable claim under section 1983; and (4) they are entitled to qualified immunity. (Docket No. 197–2, at 5, 8, 9, & 11.)

On June 23, 2009, plaintiffs opposed the mayor and the Municipality of Barcelone-

ta's motion for summary judgment. (Docket No. 214.) In their memorandum, plaintiffs' primarily argue that: (1) that they have a right to possess pets in their residency; (2) the Fourth Amendment recognized plaintiffs' property interests in their pets; (3) under the Fourteenth Amendment they were entitled to pre and post deprivation remedies; (4) they are entitled to injunctive relief. (*Id.* at 5, 9, 31 & 37.) The mayor and the municipality replied to plaintiffs opposition to the motion for summary judgment. (Docket No. 230.) The defendants argue that: (1) plaintiffs have not provided any factual basis for supporting their federal claims; (2) since plaintiffs failed to demonstrate that 12 of households have suffered some type of injury, those claims should be dismissed; (3) plaintiffs provided no evidence contradicting defendants' evidence of an abundance of stray animals many of which were inherently dangerous; (4) plaintiffs generalized pleadings and claims do not create a basis for this case to go to trial; (5) plaintiffs provided no evidence that the mayor entered their homes nor that he did anything other than knock on their doors and sustain a conversation with them; (6) plaintiffs fail to cite any municipal policy that compels a violation of the Fourth Amendment; (7) plaintiffs provide no basis to support a permanent injunction against the municipality; and (8) plaintiffs procedural due process claims must fail since this action was brought prior to pursuing any administrative or state based remedy. (*Id.* at 4–6, 8, 10–11 & 13.)

On June 30, 2009, plaintiffs filed a memorandum of law in opposition to codefendants' motion for summary judgment. (Docket No. 224.) Plaintiffs argue that the co-defendants are not entitled to qualified immunity (*id.* at 26), and that summary judgment is unwarranted for two reasons, first, because the codefendants failed to address the claims under the Fourth and Fourteenth Amendments, and second, because there were controversies of facts and issues of credibility. (*Id.* at 28.) Finally, on July 17, 2009, the co-defendants filed a reply brief to plaintiffs' opposition to motion for summary judgment. (Docket No. 243.) In their motion the co-defendants argue that plaintiffs must individually present a *prima facie* case, against each and every one of them, for violating the Fourth Amendment. (*Id.* at 2, ¶ 2.) The co-defendants further claim that plaintiffs have not demonstrated that each and every one of them entered into any of the housing units. (*Id.* at 4, ¶ 3.) In addition, the co-defendants request to join the mayor and the municipality's reply, and move for the dismissal of their individual claims. (*Id.* at 5, ¶ 2.)

## III. STANDARD OF REVIEW

### A. Summary Judgement

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The intention of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000) (quoting

*DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997)).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Carroll v. Xerox Corp.,* 294 F.3d 231, 236–37 (1st Cir.2002) (quoting *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1251 (1st Cir.1996)) (" '[N]either conclusory allegations [nor] improbable inferences' are sufficient to defeat summary judgment."). The nonmoving party must produce "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)); *see also López Carrasquillo v. Rubianes,* 230 F.3d 409, 413 (1st Cir.2000).

"A genuine issue exists when there is evidence sufficient to support rational resolution of the point in favor of either party." *Nereida–González v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *United States v. One Parcel of Real Prop.,* 960 F.2d 200, 204 (1st Cir.1992)). "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party . . . ." *Burke v. Town of Walpole,* 405 F.3d 66, 75 (1st Cir.2005) (quoting *United States v. One Parcel of Real Prop.,* 960 F.2d at 204).

Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, a moving party "may move for summary judgment 'with or without supporting affidavits.'" *Id.* at 323, 106 S.Ct. 2548 (quoting Rules 56(a) and (b)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see also Patterson v. Patterson,* 306 F.3d 1156, 1157 (1st Cir.2002) (quoting *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990)) ("[the court] must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.").

### B. Puerto Rico Local Rule 56

In the District of Puerto Rico, Local Rule 56(b), previously Local Rule 311(12), imposes additional requirements on the party filing for summary judgment as well as the party opposing the motion. A motion for summary judgment has to be accompanied by "a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried. Each fact asserted in the statement shall be supported by a record citation as required by subsection (e) of this rule." *Local Rules of the United States District Court for the District of Puerto Rico,* Local Rule 56(b) (2004). When filing a motion in opposition, the opposing party must include a separate, short, and concise statement admitting, denying or qualifying each fact set out by the moving party. Local Rules 56(c); *see Morales v. A.C. Orssleff's EFTF,* 246 F.3d 32, 33 (1st Cir.2001); *Ruiz Rivera v. Riley,* 209 F.3d 24, 27–28 (1st Cir. 2000); *Domínguez v. Eli Lilly & Co.,* 958

F.Supp. 721, 727 (D.P.R.1997); *see also Corrada Betances v. Sea–Land Serv., Inc.,* 248 F.3d 40, 43 (1st Cir.2001).

▉ These facts must be supported by specific reference to the record, thereby pointing out to the court any genuine issues of material fact and eliminating the problem of the court having "to ferret through the Record." *Domínguez v. Eli Lilly & Co.,* 958 F.Supp. at 727; *see Carmona Ríos v. Aramark Corp.,* 139 F.Supp.2d 210, 214–15 (D.P.R.2001) (quoting *Stepanischen v. Merch. Despatch Transp. Corp.,* 722 F.2d 922, 930–31 (1st Cir.1983)); *Velázquez Casillas v. Forest Lab., Inc.,* 90 F.Supp.2d 161, 163 (D.P.R. 2000). Any statement of fact provided by any party which is not supported by citation to the record may be disregarded by the court, and any supported statement which is not properly presented by the other party shall be deemed admitted. *See* Local Rule 56(e). Failure to comply with this rule may result, where appropriate, in judgment in favor of the opposing party. *Morales v. A.C. Orssleff's EFTF,* 246 F.3d at 33; *Stepanischen v. Merch. Despatch Transp. Corp.,* 722 F.2d at 932.

## IV. DISCUSSION

### A. Standing

The mayor and the Municipality of Barceloneta argue that twelve[1] of the plaintiffs' households lack standing to maintain suit because they did not lose any pets nor did they suffer any injury. (Docket No. 182–3, at 17.) Plaintiffs in turn request that Exhibit 7, which the defendants rely on for their proposition, be stricken because it does not comply with the requirements set forth by Federal Rule of Civil Procedure 56(e) and Local Rule 56, since according to plaintiffs it was generated by the defendants' counsel. (Docket No. 214, at 44 & 45.)

This court has stated in numeral occasions "that '[d]ocuments supporting or opposing summary judgment must be properly authenticated.'" *Rivera Maldonado v. Hosp. Alejandro Otero López,* 614 F.Supp.2d 181, 185 n. 1 (D.P.R.2009) (quoting *Carmona v. Toledo,* 215 F.3d 124, 131 (1st Cir.2000) (citing Fed. R. Civ P. Rule 56(e))). Consequently, "[t]he failure to authenticate a document properly precludes its consideration on a motion for summary judgment." *Id.* (quoting *Robinson v. Bodoff,* 355 F.Supp.2d 578, 582 (D.Mass. 2005)). After reviewing the document in question I find that it has not been properly authenticated by the defendants as required by Rule 56(e). Nevertheless, the exclusion of this document is by itself insufficient to withhold the court from dismissing plaintiffs' claims against the defendants since there is no evidence on the record that would in fact demonstrate that the plaintiffs from these 12 households suffered any type of injury. In fact, plaintiffs simply decided to ignore this issue by not addressing it at all. Also, after sorting through plaintiffs' extensive statement of uncontested facts it is without a doubt clear that these plaintiffs lack standing

---

1. The plaintiffs who according to the defendants lack standing are: (1) Carmen Luz Agosto and her children, Priscilla Howard, John Howard, Edwin Howard and Joshua Lamoutte; (2) Lisette Agosto Román, and her child Byron Cancel; (3) Daisy Caballero Cruz, and her children Wilfredo de León Caballero, Adnersy Rodríguez Caballero, Rafael J. Rodríguez Caballero, and Melquisedec Maisonet Caballero; (4) Evelyn Talavera and her children, Héctor and Luis Laureano; (5) Vanessa Gutiérrez and her children Stephanie Moya and Kenneth Escobar; (6) Elba Iris Guzmán Reyes; (7) Blanca Iris Medina Cruz and her child Carla Michelle Colón; (8) Mariyunaira Rivera and her child Víctor Manuel Negro; (9) Andrea Rodríguez Otero and her husband Féliz de León; (10) Jacqueline Santiago Casanova and her child Kiara Rodríguez Santiago; (11) Evelyn Soler Dávila; (12) Elvia Tirado.

since they did not lose any pets nor did they suffer any type of damage as a result of the defendants' actions. (Docket 214–2, at 51, ¶¶ 61–70; at 57, ¶¶ 115–23; at 64, ¶¶ 169–85; at 66, ¶¶ 186–91; at 72, ¶¶ 223–37; at 76, ¶¶ 248–51; at 77, ¶¶ 252–58; at 78, ¶¶ 259–71; at 79, ¶¶ 272–79; at 80, ¶¶ 280–88; at 81, ¶¶ 289–95; at 84, ¶¶ 312–15.)

 Plaintiffs brought their suit under 42 U.S.C. § 1983. "Section 1983 authorizes actions for equitable relief and/or damages against 'every person who under color of any … custom or usage, of any State or Territory … subjects or causes to be subjected any citizen of the United States or other person … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Cruz Serrano v. Sánchez–Bermúdez*, 183 F.Supp.2d 442, 445 (D.P.R.2001) (quoting 42 U.S.C. § 1983.) Therefore, "in order to state a claim cognizable under Section 1983, [p]laintiff[s] must allege 'that some person has deprived [them] of a federal right.'" *Id.* (quoting *Gómez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)). "To prevail in an action brought under 42 U.S.C. § 1983, [p]laintiff[s] must satisfy two prongs. First, [they] must prove that [they were] deprived of a right, immunity, or privilege secured by the Constitution or laws of the United States." *Id.* (citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Voutour v. Vitale*, 761 F.2d 812, 819 (1st Cir.1985)). "Second, [they] must have been deprived of [their] right, immunity or privilege, by a person acting under color of state law." *Id.* Hence, "a person may not sue, nor recover damages, for the deprivation of another person's civil rights under section 1983." *Cruz Serrano v. Sánchez–Bermúdez*, 183

F.Supp.2d at 447 (citing *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir.1991); *Quiles ex rel. Proj. Head Start v. Hernández Colón*, 682 F.Supp. 127 (D.P.R.1988)). In other words, "[o]nly the person towards whom the state action was directed, and not those individuals incidentally affected, may bring a section 1983 action for a violation of due process rights." *Cruz Serrano v. Sánchez–Bermúdez*, 183 F.Supp.2d at 447 (quoting *Soto v. Carrasquillo*, 878 F.Supp. 324, 326 (D.P.R.1995) (citing *Manarite By & Through Manarite v. City of Springfield*, 957 F.2d 953, 960 (1st Cir.1992); *Pittsley v. Warish*, 927 F.2d at 8; *Hegarty v. Somerset County*, 848 F.Supp. 257, 268 (D.Me.1994); *Natriello v. Flynn*, 837 F.Supp. 17, 19 (D.Mass.1993); *Martínez Correa v. López Feliciano*, 759 F.Supp. 947, 958 (D.P.R.1991))).

Here, it is evident that plaintiffs fail to satisfy the first prong simply because their constitutional rights under the Fourth Amendment and Fourteenth Amendment have not been violated. Hence, I need not make any further inquires as to the second prong of the test, and find that plaintiffs lack standing to bring a 42 U.S.C. § 1983 lawsuit.

### B. Plaintiffs' Federal Claims

The mayor and the Municipality of Barceloneta, make several arguments in order to establish that plaintiffs' rights under the Fourth Amendment have not been violated. First, they state that the plaintiffs who did not lose any animals as well as those who voluntarily delivered their animals had as their sole or primary interaction with the defendants a conversation after the defendants knocked on their doors, which does not constitute a violation under the Fourth Amendment. (Docket No. 182–3, at 19–21.) Second, all of the conversations that were sustained with the

plaintiffs were consensual,[2] and the plaintiffs who voluntarily delivered their animals did not suffer any intrusion of a privacy interest protected by the Fourth Amendment. (*Id.* at 22–25.) Third, taking an animal that is reasonably deemed to be stray in a public space does not contravene the Fourth Amendment.[3] (*Id.* at 25–28.) Four, balcony areas do not provide plaintiffs with a reasonable expectation of privacy.[4] (*Id.* at 29–31.) Five, even if some of their actions constituted an intrusion of an interest protected by the Fourth Amendment, they were not invasive but administrative in nature and therefore did not violate the Fourth Amendment. (*Id.* at 32–33.) Finally, the defendants state that even if plaintiffs proved a violation of a right protected by the Fourth Amendment, they did not provide any basis to support a claim that the mayor violated a clearly established right and therefore was entailed to qualified immunity. (*Id.* at 33–34.) As to the co-defendants Leonides González, Sylvia Riquelme, Esther Ruiz, Ahmid Molina Morales and Edgardo Santiago they basically argue that plaintiffs' Fourth Amendment claim against them fails because some of them did not enter any of the housing units while others were invited in. The codefendants also claim

that plaintiffs have not presented a cognizable claim under section 1983, and that they are entitled to qualified immunity. (Docket No. 197.)

Plaintiffs on the other hand argue that their pets were seized by the defendants notwithstanding their right to be protected under the Fourth Amendment as the First Circuit acknowledged in a recent decision where it stated that "[a]n individual's interest in his [pets] does fall within the Fourth Amendment's prohibition of unreasonable seizures ... [thus] pets are 'effects' under the seizure clause of the Fourth Amendment. [And pets] are 'effects' for purposes of being secure from unreasonable seizure under the Fourth Amendment." (Docket No. 214, at 9, ¶ 4 & at 11) (quoting *Maldonado v. Fontanés,* 568 F.3d at 270–71.) In addition, plaintiffs claim that their dogs were in their homes and not on the loose, growling, acting fiercely, or harassing anyone at the time they were seized by the defendants. Plaintiffs claim that the defendants went into their backyards and removed their pets which were tied with a leash. (Docket No. 214, at 12, ¶ 3.) Plaintiffs further claim that their homes have gates which need to be opened in order to get to the

---

**2.** The plaintiffs who, according to the defendants, voluntarily delivered their animals to either a municipal employee or a private contractor are: (1) Rafet Candelaria; (2) Jéssica Fuentes Negrón, her husband José Rodríguez Marín and their children David Fuentes and José E. Rodríguez Fuentes; (3) Ramona Ojeda González, and (4) María Ríos Colón and her children Carlos David Colón, Leoniel Meléndez and Jesús Meléndez.

**3.** The plaintiffs who claim that their animals were taken while running loose in a public area are: (1) Jennifer Candelaria and her children Janice and Joedniel Torres; (2) Sonia Kortright Sánchez; (3) Maribel Rivera and her children Keysha and Naysha Rivera; and (4) Antonia Morales Reyes and her children Kelvin and Randy Morales.

**4.** The plaintiffs that claim that the defendants took their animals from their balconies are: (1) Madeline Maldonado and her husband Abrahan Valencia Maysonet and their children Álex, Edgar and Christian Valencia Maldonado; (2) Ángel Rafael Sierra and his wife Evelyn Vázquez and their children Angélica, Karina Sorimar, Christopher, Neysha and Miguel Ángel Sierra Vázquez; (3) Angélica Valle and her children Elbi, Kelvin and Idaly Molina; (4) Carmen Valle Felicié (5) Judith Varela and her children Johamed and Ashly Rivera; (6) Carmen Vázquez and her children Derek Cruz and Álex Joel Vázquez; (7) Ruth Vidot and her children Jahaira Santana, Luisa Santana, Grace Santana, Virgen Rivera and María Dahlia Rivera.

back of the house, and that some of the apartments have a balcony and a laundry area. (*Id.* ¶ 4.) Moreover, according to the plaintiffs those whose houses were not breached, were put under duress because the defendants threatened them with being evicted, made loud knocks on their doors, had a hostile attitude, made haughty tones, and also shook and rattled their doors. (*Id.* at 28, ¶ 1.) Plaintiffs also argue that the defendants' entry into their homes was illegal since it does not fall under any of the exceptions for a warrantless search, nor could it be justified as a reasonable administrative search since they have not identified a special need, an emergency or exigent circumstance to dispense with the warrant requirements. (*Id.* at 28–29 & 31.)

### 1. Fourth Amendment

#### a. Intrusion of Privacy Interest

 The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. "At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *United States v. Antone,* 479 F.Supp.2d 255, 259 (D.R.I.2007) (quoting *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). As such, "a warrantless intrusion into someone's home is presumptively unreasonable under the Fourth Amendment, 'subject only to a few specifically established and well-delineated exceptions.'" *United States v. Antone,* 479 F.Supp.2d at 259 (citing *Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)); (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "One such exception is for entries authorized by valid consent." *United States v. Antone,* 479 F.Supp.2d at

259–60 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Laine,* 270 F.3d 71, 74–75 (1st Cir.2001)). "When this exception is in play, the government has the burden to prove, by a preponderance of the evidence, two fact bound elements." *United States v. Antone,* 479 F.Supp.2d at 260 (citing *United States v. Schaefer,* 87 F.3d 562, 569 (1st Cir.1996)). The first of these elements, is referred to as consent-in-fact, which "requires a showing that consent actually was rendered, whether it be done expressly through oral invitation, or impliedly through gesture or conduct." *United States v. Antone,* 479 F.Supp.2d at 260 (citing *United States v. Forbes,* 181 F.3d 1, 7 (1st Cir.1999); *United States v. Miller,* 589 F.2d 1117, 1130 (1st Cir.1978); *Robbins v. MacKenzie,* 364 F.2d 45, 48–49 (1st Cir.1966)). The second element "requires a showing that consent was voluntary; that is, 'the product of an essentially free and unconstrained choice,' and not 'the product of duress or coercion, express or implied.'" *United States v. Antone,* 479 F.Supp.2d at 260 (quoting *United States v. Chhien,* 266 F.3d 1, 7 (1st Cir.2001) (quoting *Schneckloth v. Bustamonte,* 412 U.S. at 225, 93 S.Ct. 2041); *United States v. Luciano,* 329 F.3d 1, 7 (1st Cir.2003) (quoting *Schneckloth v. Bustamonte,* 412 U.S. at 227, 93 S.Ct. 2041)).

 Moreover, 42 U.S.C. § 1983 protects citizens from state deprivations of their constitutional rights, including their right to be free from unreasonable seizures as guaranteed by the Fourth Amendment. *Soldal v. Cook County, Ill.,* 506 U.S. 56, 60 n. 6, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (citing *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). A seizure takes place when "there is some meaningful interference with an individual's possessory interest in ...

property." *Soldal v. Cook County, Ill.,* 506 U.S. at 61, 113 S.Ct. 538 (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)).

■ Thus, an individual's pets qualifies as an effect for the purpose of the Fourth Amendment, and therefore is protected against unreasonable searches and seizures. *Maldonado v. Fontanés,* 568 F.3d at 271. Also, killing a person's dog or cat without their consent is also a seizure within the meaning of the Fourth Amendment. *Id.* "[S]eizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal v. Cook County, Ill.,* 506 U.S. at 68, 113 S.Ct. 538. A seizure does not offend the Fourth Amendment if the defendants can establish that it was made with the plaintiffs' voluntary consent. *See Schneckloth v. Bustamonte,* 412 U.S. at 219, 93 S.Ct. 2041. In *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Court stated that consent that is the product of official intimidation or harassment is not consent at all, and further noted that citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse.

Here, all of the defendants argue that plaintiffs who voluntarily delivered their animals did not suffer any intrusion of a privacy interest protected by the Fourth Amendment since plaintiffs only had a conversation with the defendants after knocking on their doors. Plaintiffs however claim that they were put under duress because the defendants threatened them with being evicted. Plaintiffs also claim that the defendants made loud knocks on their doors, had a hostile attitude, made haughty tones, and shook and rattled their doors. All reasonable inferences having been made in favor of the plaintiffs they

did not voluntarily deliver their pets to the defendants. Thus, plaintiffs' rights under the Fourth Amendment were violated.

Plaintiff Jessica Fuentes Negrón was told that her lease contract would be cancelled if she did not surrender her dogs. (Docket No. 214–79, at 6:1–8.) In light of this, Mrs. Fuentes decided not to risk such action and decided to give her pets away to the municipality. (*Id.* at 10–12.) Mrs. Fuentes agreed to turn her pets over with the condition that they be taken to a shelter. (*Id.*) However, Mrs. Fuentes' pets were taken from her backyard without her consent. (*Id.* at 15–24.) Two days after the incident Mrs. Fuentes authorized her brother-in-law to surrender her other dog. (*Id.* at 8:1–5.) It can be inferred that the reason why Mrs. Fuentes decided to surrender her other dog was because she was still afraid of being evicted from her apartment. In the case of plaintiff Ramona Ojeda her cats were taken from her lap. (Docket No. 214–61, at 4:1–5.) Mrs. Ojeda also decided to turn over her cats after being told that she had to or that her lease contract was going to be cancelled. (*Id.* at 4:6–8 and at 5:3–17.) Plaintiffs Rafet Candelaria and María Ríos Colón, like the other plaintiffs who were facing eviction if they did not comply with the defendants' request, decided to surrender their pets. (Docket No. 183, Exhibit 22, at 8:6–25 and at 9:1–15 and Docket No. 214–40, at 6:20–24 and at 7:1–13.)

Defendant Ahmid Molina Morales, who is the Director of Emergency Management for the Municipality of Barceloneta, participated in the events that had taken place on October 8 and 10, 2007. Mr. Molina coordinated the pick up of the stray dogs as well as of those belonging to the plaintiffs. Mr. Molina knocked on the doors of the plaintiffs and told them they would be evicted if they did not surrender their pets. (Docket No. 197–2, at 6, ¶ 2 & Dock-

et No. 224–15, at 4:4–9.) Also, defendant Sylvia Riquelme, who was the administrator of Plazuela Housing Project located in Barceloneta, participated along with Mr. Molina in the removal of the pets. (Docket No. 197–2, at 7, ¶ 3 & Docket No. 224, at 23.) Defendant Leonides González, administrator for Quintas de Barceloneta Housing Project, claims that she did not enter any of the residential housing units on either October 8 and 10, 2007. (Docket No. 197–2, at 7, ¶ 2.) However, according to at least one of the plaintiffs Mrs. González was present on October 8, 2007, along with Mr. Molina and told plaintiff that the pets had to be surrendered or that they would cancel the lease contract. (Docket No. 214–62, at 5:1–4.) Defendant Esther Ruiz, the Director of Federal Programs for the Municipality of Barceloneta, like Mrs. González, claims that she was not present during the events that took place at the different public housing complexes on October 8 and 10, 2007 (Docket No. 197–2, at 5, ¶ 2) but in her deposition she stated that she was present but could not remember if it was on October 8 or 10, 2007. (Docket No. 224–3, at 4:1–8.) Defendant Edgardo Santiago actively participated in the collection of animals at the public housing complexes. (Docket No. 239–4.) In fact, Mr. Santiago was the one who entered into Mrs. Fuentes apartment but claims that he only did so after Mrs. Fuentes had agreed to surrender her dog. (Docket No. 197–2, at 8.) Like the other defendants the mayor was also present during the incursion into some of the public housing complexes. The mayor went to some of the plaintiffs' apartments knocked on their doors and told plaintiffs that their lease contracts would be canceled if they did not surrender their pets. (Docket No. 214–25.)

The defendants try to justify taking plaintiffs' pets by arguing that they were voluntarily turned over by their owners after sustaining a conversation that according to the defendants was consensual, and thus did not violate plaintiffs' rights under the Fourth Amendment. The issue here is whether plaintiffs voluntarily turned over their pets and consented to their destruction, and not whether the conversation that plaintiffs sustained with the defendants did not infringe upon their rights under the Fourth Amendment. Regardless of whether the defendants' intrusion into plaintiffs' homes was not by itself unreasonable, assuming that plaintiffs lent their consent, it does not mean that by doing so plaintiffs voluntarily gave their pets to the defendants and thus consent to their destruction. On the contrary the evidence shows that plaintiffs gave their pets away only after they were told by defendants that they would be evicted if they did not do so. Assuming that plaintiffs voluntarily gave their pets to the defendants they did so without knowing that they were going to be killed. The defendants' arguments are unavailing.

b. Taking of Animals Reasonably Deemed to be Stray

The defendants argue that taking and destroying an animal that is reasonably deemed to be dangerous or stray in a public space does not contravene the Fourth Amendment. The defendants claim that some of plaintiffs' dogs that were running around loose were dangerous and posed a threat to the health of the community. Thus, the defendants believe that they acted reasonably in collecting the animals, and that plaintiffs' rights under the Fourth Amendment were not violated.

McQuillin states that "[m]unicipal corporations ordinarily may and frequently do prohibit under penalty the owner or keeper of dogs from letting them run at large and require that the owner or keeper confine his or her dog to the owner's premises

or keep it on leash. Such an ordinance has been held not in conflict with state statutes. The ordinance also may provide for the destruction of dogs found running at large." 7 Eugene McQuillin, *The Law of Municipal Corporations* § 24:286 (3d ed. 2004). "The general rule is that a dog is running at large where the dog is running without control or beyond the control of his or her owner or keeper. The animal is going at large, although following its master or keeper, at such a distance that it is not under adequate control to prevent its doing mischief." *Id.*

The defendants argue that the dogs that belonged to four of the plaintiffs' households were taken loose in a public area, were dangerous and posed a threat to the health of the community. I disagree. According to plaintiff Sonia Kortright Sánchez, one of her dogs ran out of her apartment while the defendants were collecting the animals, and despite her requests the defendants refused to give her back her dog. (Docket No. 214–56, at 6:15–25.) The defendants do not deny that Mrs. Kotright's dog was taken by them. They justify taking Mrs. Kotright's dog by arguing that it posed a danger to the community because it was a pit bull. However, the only evidence supporting the defendants' argument is Mrs. Kotright's own deposition testimony in which she stated that the dog that she owned was an American Stafford Terrier. (Docket No. 183, Exhibit 27.) The defendants state that according to the United Kennel Club American Stafford Terries are by all means a pit bull. (Docket No. 182–3, at 9.) However, besides Mrs. Kotright's deposition testimony there is no evidence on the record that would show that her dog in effect posed a danger to the community. Also, the defendants fail to point out whether Mrs. Kotright violated a particular state law for owning that particular breed of dog that would have allowed them to seize her dog without needing her consent. Thus, the defendants' argument is unavailing since they have failed to provide any evidence that would demonstrate that Mrs. Kotright's dog posed a danger to the community. In the case of plaintiff Antonia Morales Reyes, the defendants again justify their actions by saying that her dog was a stray because it was taken from a public area. Nevertheless, the defendants' argument is mistaken since the record shows that Mrs. Morales' son was with the dog at the time it was taken by the defendants. (Docket No. 214–42, at 6:7–14.) Therefore, Mrs. Morales' dog was not running loose at the time it was taken. The defendants have not provided any evidence that would show the contrary. With respect to plaintiff Maribel Rivera Varela, she was not in her apartment when her dog was collected. According to Mrs. Rivera her dog escaped while her boyfriend was trying to move him from the laundry area into her apartment, and the defendants refused to turn over her dog even though her boyfriend asked them to. (Docket No. 214–54, at 4:14–25; at 5:10–15; at 6:5–7.) The defendants again fail to set forth any evidence that Mrs. Rivera's dog was astray at the time it was taken. Like the other plaintiffs Jennifer Jiménez Candelaria's dog was taken after it escaped. Mrs. Jiménez' dog was, according to her, tied up to the gate of her balcony and escaped while she was trying to get him into the apartment. (Docket No. 214–52, at 3–4.) Mrs. Jiménez' dog ran toward her mother's house where he was taken. (*Id.*) Mrs. Jiménez was told that she could not have pets in the apartment or she would be evicted. Mrs. Jiménez was also told that she did not have to worry about her dog because it was going to be taken to a shelter. (*Id.* at 4.) Mrs. Jiménez handed over her dog to the municipal authorities because she felt threaten of losing her home. (*Id.* at 6.)

There is no evidence on the record that shows that the dogs belonging to the plaintiffs were either running at large or dangerous.

### c. Reasonable Expectation of Privacy

 According to the defendants the balcony areas where the pets were kept did not provide plaintiffs with a reasonable expectation of privacy. Although the Fourth Amendment prohibits unreasonable searches and seizures, "it is well-settled that government intrusions upon personal privacy only implicate the constitution 'if the challenged conduct infringes upon some reasonable expectation of privacy.'" *United States v. Zak,* 476 F.Supp.2d 29, 34 (D.Mass.2007) (quoting *Vega–Rodríguez v. P.R. Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997) (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979))). In order to be protected under the Fourth Amendment, "a privacy expectation must meet both subjective and objective criteria: the complainant must have an actual expectation of privacy, and that expectation must be one which society recognizes as reasonable." *United States v. Zak,* 476 F.Supp.2d at 34–35 (quoting *United States v. Burnette,* 375 F.3d 10, 16 (1st Cir.2004)). An individual has a reasonable expectation of privacy within the curtilage. *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). "The "curtilage" refers to [p]laces [that are] adjacent to [a person's] home, [which] have generally been subject to the warrant requirement so far as the government agent intrudes beyond areas (e.g., the path to the front door) where uninvited visitors are expected." *Bilida v. McCleod,* 211 F.3d 166, 171 (1st Cir.2000). "When determining whether a given location falls within the home's curtilage, we look to whether it is 'so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.'" *United States v. Brown,* 510 F.3d 57, 64 (1st Cir.2007) (quoting *United States v. Diehl,* 276 F.3d 32, 38 (1st Cir.2002) (quoting *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987))). In this case, in order to determine whether the balcony areas provided plaintiffs with a reasonable expectation of privacy I must take into account the following: "(1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 65.

The record in this case does not clearly resolve the issue of whether the areas in which plaintiffs kept their pets are part of the curtilage or whether, if it is, that plaintiffs had a reasonable expectation of privacy therein. Plaintiffs claim that their pets were in their homes and not running loose, and that the defendants took them from their backyards, balconies and laundry areas without their consent. It appears that plaintiffs who kept their pets in their balconies did not have any type of barriers that would have prevented their pets from wandering into a public area. The record only shows that of all of the plaintiffs two claim that the area where they kept their pets was fenced. Some of the plaintiffs claim that their pets were tied up at the time they were taken by the defendants. As to those plaintiffs who kept their pets in an enclosed space like the laundry or backyard, it appears that they were not also protected from observation by the general public. Regardless of whether plaintiffs had a reasonable expectation of privacy, protection under the Fourth Amendment is afforded since "[t]he killing of a person's pet dog or cat by the government without the person's consent [consti-

tutes] a seizure....” *Maldonado v. Fontanés*, 568 F.3d at 271 (citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir.2001); *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir.1994), *overruled on other grounds by Robinson v. Solano County*, 278 F.3d 1007 (9th Cir.2002); *Lesher v. Reed*, 12 F.3d 148, 150–51 (8th Cir.1994); *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir.2008)).

d. Administrative Searches and Seizures

 ██ “The Fourth Amendment protects citizens against unreasonable searches and seizures and ordinarily requires searches to be made pursuant to a warrant supported by probable cause.” *Eisenberg v. Wall*, 607 F.Supp.2d 248, 254 (D.Mass.2009) (citing U.S. Const. amend. IV). In the same manner, “[a]dministrative searches are not exempt from the warrant requirement, but they are subject to a less stringent probable cause standard than criminal searches.” *Eisenberg v. Wall*, 607 F.Supp.2d at 254 (citing *Camara v. Mun. Court*, 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320–21, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978)). “[A]dministrative warrants are justified where there is specific evidence of an existing violation of an administrative code or safety regulation.” *Eisenberg v. Wall*, 607 F.Supp.2d at 254 (citing *Marshall v. Barlow's, Inc.*, 436 U.S. at 320–21, 98 S.Ct. 1816). Nevertheless, “a residential search pursuant to an established warrantless search procedure my be reasonable if conducted in furtherance of an important administrative or regulatory purpose, or special need....” *McCabe v. Life–Line Ambulance Serv., Inc.*, 77 F.3d 540, 545 (1st Cir.1996) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)).

The defendants argue that they did not violate plaintiffs' rights under the Fourth Amendment because their actions were reasonable and administrative in nature, and therefore a warrant was not needed. The defendants believe that their actions were reasonable because, according to them, they went to great lengths to ensure that all the residents received notice of the pet policy including reading aloud the notice to residents who could not read. Also, the defendants state that when the residents admitted to having non-conforming animals they did not pursue the matter and simply left. These acts alone do not justify the defendants' actions. In order to gain entry into plaintiffs' apartments, the defendants had to, but did not comply with the regulatory criteria of 24 C.F.R. § 966.4(j)(k), and with the terms and conditions found in the lease contracts. Under section 966.4 entry into the tenants' apartment is allowed in order to perform a routine inspection and make improvements or repairs, only after the tenant has received reasonable notification. Also, if at the time of entry there is no one at the apartment, a written statement must be left specifying the time, date and purpose of entry prior to leaving the unit. Notification is also required under part eight of the lease agreement. (Docket No. 214–14, at 6.)

e. Qualified Immunity

 Defendant Mayor Fontanés as well as the co-defendants argue that they are entitled to qualified immunity because plaintiffs have not demonstrated that their actions violated a clearly established constitutional right of which a reasonable person would have known. “The qualified immunity doctrine protects civil servants from suit and liability arising from the performance of their duties 'insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known.'” *Aldarondo–Lugo v. Municipality of Toa*

*Baja,* 329 F.Supp.2d 221, 225 (D.P.R.2004) (quoting *Mihos v. Swift,* 358 F.3d 91, 101 (1st Cir.2004) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982))). "However, the qualified immunity defense can only be raised by persons sued in their personal capacity, not in their official capacity." *Valentín Rodríguez v. Municipality of Barceloneta,* 236 F.Supp.2d 189, 194 (D.P.R.2002) (citing *Suárez–Cestero v. Pagán–Rosa,* No. 02–1562, 02–1563, slip op. at 2 (1st Cir. Sept. 9, 2002); *González v. Tirado–Delgado,* 990 F.2d 701, 705 (1st Cir.1993)). "It has been well established that an official capacity suit is not really against the governmental actor, but instead, is actually a suit against the governmental entity." *Valentín Rodríguez v. Municipality of Barceloneta,* 236 F.Supp.2d at 194 (citing *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "Therefore, when a plaintiff seeks relief from a defendant in his capacity as an officer of the state, qualified immunity is not a viable defense." *Valentín Rodríguez v. Municipality of Barceloneta,* 236 F.Supp.2d at 194 (citing *Rodríguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 38–40 (1st Cir.1993)). As such, "this defense is not available to [d]efendants, in their official capacity; it is only available to them in their personal capacity." *Valentín Rodríguez v. Municipality of Barceloneta,* 236 F.Supp.2d at 194. When determining if a public official is entitled or not to qualified immunity, courts use a three part test which consists of the following: "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether the constitutional right at issue was clearly established at the time of the putative violation; and (3) whether a rea-

sonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Aldarondo–Lugo v. Municipality of Toa Baja,* 329 F.Supp.2d at 225 (quoting *Limone v. Condon,* 372 F.3d 39, 44 (1st Cir.2004) (citations omitted)).

"An individual's interest in his pet cat or dog does fall within the Fourth Amendment's prohibition of unreasonable seizures . . . ." and "[t]he killing of a person's pet dog or cat by the government without the person's consent [constitutes] a seizure within the meaning of the Fourth Amendment." *Maldonado v. Fontanés,* 568 F.3d at 270–71. Thus, the "Mayor's argument that this law was not clearly established because . . . [it] had not earlier addressed the questions of effects and seizure" was rejected given that there was a "widespread acceptance of these points in the federal circuit courts . . . ." *Maldonado v. Fontanés,* 568 F.3d at 271. The remaining issue is whether a reasonable person in the mayor's position should have known that his conduct violated plaintiffs' clearly established rights. *See Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue."). However, until a jury renders a verdict regarding these factual questions, the court is unable to make a determination regarding qualified immunity. *See Suárez Cestero v. Pagán Rosa,* 198 F.Supp.2d 73, 93 (D.P.R.2002). I recommend that the mayor's request for qualified immunity be denied. For the same reasons, I find that co-defendants' request for qualified immunity should also be denied.

### f. Section 1983

Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory....'" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (quoting 42 U.S.C. § 1983). "It is well settled that in order for a claim to be cognizable under Section 1983, the complaining party must allege that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct constitutes a deprivation of a constitutional right or a federal statutory right." *Concepción v. Municipality of Gurabo*, 558 F.Supp.2d 149, 162 (D.P.R. 2007) (citing *Parratt v. Taylor*, 451 U.S. 527, 536, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Martínez–Rodríguez v. Colón–Pizarro*, 54 F.3d 980 (1st Cir.1995); *Martínez–Vélez v. Simonet*, 919 F.2d 808, 810 (1st Cir.1990); *Vicenty–Martell v. Estado Libre Asociado de P.R.*, 48 F.Supp.2d 81, 89 (D.P.R.1999)). "This second prong has two aspects: (1) there must have been an actual deprivation of the plaintiff's federally protected rights; and (2) there must have been a causal connection between the defendant's conduct and the deprivation of the plaintiff's federal rights." *Concepción v. Municipality of Gurabo*, 558 F.Supp.2d at 162 (citing *Gutiérrez–Rodríguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir.1989); *Voutour v. Vitale*, 761 F.2d at 819).

The first element is satisfied against all of the defendants because they are all officials of the Municipality of Barceloneta, and they acted in their capacity as such. In determining whether the second element is satisfied it is important to look at the decision that "[a]n individual's interest in his pet cat or dog does fall within the Fourth Amendment's prohibition of unreasonable seizures ..." and that "[t]he killing of a person's pet dog or cat by the government without the person's consent [constitutes] a seizure within the meaning of the Fourth Amendment." *Maldonado v. Fontanés*, 568 F.3d at 270–71. The decision clearly establishes that a deprivation of a person's constitutional rights or a federal statutory right occurs when, a person's property, or as in this case its pets, are taken and killed by the government without their consent. However, there must be a causal connection between the defendants' conduct and the deprivation of the plaintiffs' federal rights. In this case the Municipality of Barceloneta was responsible for enacting Ordinance No. 33 which did not allow plaintiffs to have pets in their apartments and permitted the municipality to contract a private company for the pick up and disposal of plaintiffs' pets. (Docket No. 214–2, at 38, ¶ 3 & Docket No. 230–2, at 3, ¶ 4.) The Municipality of Barceloneta then issued a purchase order to ACS to collect up to 50 animals. (Docket No. 214–2, at 44, ¶ 28 & Docket No. 230–2, at 6, ¶ 4.) After plaintiffs were informed that they were not allowed to have pets, defendants Mayor Luis Fontanés, Leonides González, Sylvia Riquelme, Esther Ruiz, Ahmid Molina Morales, Edgardo Santiago, as well as other employees from both the Municipality of Barceloneta and ACS, went into some of the public housing complexes in order to pick up of the pets that were in the possession of the plaintiffs. (Docket No. 214–2, at 45, ¶ 31; Docket No. 230, at 7, ¶ 1; Docket No. 239–3; Docket No. 197–2, at 6, ¶ 2, at 7, ¶¶ 2 & 3, at 8; Docket No. 224, at 19, ¶¶ 4–9; Docket No. 224, at 23; Docket No. 214–62, at 5:1–4; Docket No. 224–3, at 4:1–8; Docket No. 239–4; Docket No. 214–25.) The municipal employees, including the de-

fendants, told plaintiffs that their lease contracts would be cancelled if they did not surrender their pets. Some of the plaintiffs decided to surrender their pets to the municipality because they feared that they would be evicted from their apartments, while other plaintiffs' pets were just taken from them without their consent. Plaintiffs' pets were killed and some were even thrown off a bridge to their deaths. (Docket No. 214, at 2, ¶ 4.) Thus, there is a causal connection between the defendants conduct and the deprivation of the plaintiffs' federal rights.

### g. Actions Against Municipalities Pursuant to 42 U.S.C. § 1983

The Municipality of Barceloneta argues that all of the claims that plaintiffs have made against it must be dismissed because according to them plaintiffs have failed to allege an unconstitutional implementation or execution of a municipal custom, policy ordinance or regulation to support a section 1983 action. (Docket No. 230, at 10–11.) According to the defendants there is nothing about Ordinance No. 33 that relates to the Fourth Amendment, since it only prohibits animals that are a threat to the community. The defendants also argue that plaintiffs need to either demonstrate that the municipal policy at issue was responsible for the violation or at least identify in particularity the policy responsible for the violation of plaintiffs' rights under the Fourth Amendment. I disagree.

On October 1, 2007, the Municipality of Barceloneta began as Management Agent of the three public housing complexes in the municipality. (Docket No. 214–2, at 44, ¶ 24 & Docket No. 230–2, at 5, ¶ 5.) Then, on October 2, 2007, the Municipality of Barceloneta through the administrators of each public housing development drafted a letter notifying the residents of public housing developments of a prohibition of pets in the apartments and the cancellation of the lease contract for its violation. On October 8, 2007, the mayor along with employees from both the municipality and ACS went into each of the public housing communities in order to execute an operation for the pick up of the pets in possession of public housing residents. (Docket No. 214–2, at 45, ¶ 31; Docket No. 230–2, at 7, ¶ 1 & Docket No. 239–3.) The actions undertaken by the Municipality of Barceloneta on October 8 and 10, 2007, were made pursuant to Ordinance No. 33. (Docket No. 214–78, at 4, ¶ 1.) Ordinance No. 33 was approved by the municipality. The ordinance did not allow residents to have pets in urbanizations, the town center and in housing developments. (Docket No. 214–2, at 38, ¶ 3 & Docket No. 230–2, at 3, ¶ 4.)

■■■ This court has held that "[m]unicipalities may be sued directly under section 1983 for monetary, declaratory, and injunctive relief." *Concepción v. Municipality of Gurabo,* 560 F.Supp.2d 139, 141 (D.P.R.2008) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. at 690, 98 S.Ct. 2018). "For a municipality to be liable under section 1983, however, a plaintiff must prove that a municipal policy or custom was the 'moving force [behind] the constitutional violation.'" *Concepción v. Municipality of Gurabo,* 560 F.Supp.2d at 141 (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. at 690–91, 98 S.Ct. 2018). This means that in order "to establish liability against a municipality, [plaintiffs] must prove a deprivation of a constitutional right by means of 'the execution of the government policy or custom.'" *Concepción v. Municipality of Gurabo,* 560 F.Supp.2d at 141–42 (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. at 690–94, 98 S.Ct. 2018). Furthermore, "municipal liability attaches where the decision-maker possesses final authori-

ty to establish municipal policy with respect to the action ordered." *Concepción v. Municipality of Gurabo,* 560 F.Supp.2d at 142. Also, "[u]nder Puerto Rico law, the actions of a mayor 'constitute [ ] the official policy of the municipality.'" *Id.* (quoting *Cordero v. de Jesús–Méndez,* 867 F.2d 1, 7 (1st Cir.1989)).

In this case, the Municipality of Barceloneta enacted Ordinance No. 33 which prohibited plaintiffs from having pets in their housing units. After approving the ordinance plaintiffs were notified that if they refused to surrender their pets their lease contracts would be terminated. The ordinance also allowed the municipality to contract a private company for the pick up and disposal of the animals. The Municipality of Barceloneta contracted the services of ACS for the disposal of plaintiffs' pets. The mayor authorized the operation that was conducted by employees from both the municipality and ACS, for the removal of pets of each of the public housing complexes. The mayor himself was present in some of the raids and was accompanied by municipal employees who were collecting plaintiffs' pets. Although the ordinance as drafted may not condone violating plaintiffs' constitutional rights, plaintiffs' pets were seized and destroyed without their consent thus resulting in a clear violation of their constitutional rights under the Fourth Amendment. *See Maldonado v. Fontanés.* Assuming, *arguendo,* that the defendants' action were not undertaken pursuant to the ordinance, the mayor's actions constituted the official policy of the municipality. Therefore, the municipality may be held liable under 42 U.S.C. § 1983.

### 2. Fourteenth Amendment

As to plaintiffs' substantive and procedural due process claim under the Fourteenth Amendment, the defendants argue that plaintiffs have not provided any facts supporting a violation of the substantive due process guarantees, and that the availability of state law remedies along with the lack of a violation of any federal right, prevent plaintiffs from maintaining their procedural due process claims. (Docket No. 182–3, at 35 & 39.)

Plaintiffs in turn argue that under the Fourteenth Amendment they were entitled to both pre and post deprivation remedies. Specifically, plaintiffs state that since the municipality had agreed to administer the public housing developments in Barceloneta it had the obligation of complying with the PRPHA formally adopted policies for grievance procedures and hearings (formal or informal) and any other required procedure in compliance with 24 C.F.R. Part 966, Subpart B and any other federal or state regulation. (Docket No. 214, at 32.) Also, plaintiffs state that the pet policy the defendants claim was in effect on the dates of the events as well as the revised policy that was furnished to them, mandated that a grievance procedure be applied in any situation with the pets. (*Id.*) Moreover, according to the plaintiffs the lease contracts for each and every resident provided that all disputes concerning the obligations of the tenants of the PHA had to be resolved in accordance with the PHA grievance procedure. (*Id.*)

The Fourteenth Amendment affords a "guarantee of fair procedure," making unconstitutional "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' ... *without due process of law.*" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (quoting *Parratt v. Taylor,* 451 U.S. at 537, 101 S.Ct. 1908; *Carey v. Piphus,* 435 U.S. 247, 259, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). "Procedural due process requires that 'parties whose rights are to be affected are entitled to be heard; and in order that they may

enjoy that right they must first be notified.'" *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d 226, 231 (D.P.R.2007) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)). "'[T]he prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of government interference.'" *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 231–32 (quoting *Fuentes v. Shevin*, 407 U.S. at 81, 92 S.Ct. 1983). "The fair process protects against arbitrary deprivations of property." *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (citing *Fuentes v. Shevin*, 407 U.S. at 81, 92 S.Ct. 1983). "The right to notice and a hearing 'must be granted at a time when the deprivation can still be prevented.'" *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (quoting *Fuentes v. Shevin*, 407 U.S. at 81, 92 S.Ct. 1983). "The right to a prior hearing, of course, attaches only to the deprivation of an interest encompassed within the Fourteenth Amendment's protection." *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (quoting *Fuentes v. Shevin*, 407 U.S. at 84, 92 S.Ct. 1983). "The Fourteenth Amendment's protection extends to any significant property interest. . . ." *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (citing *Fuentes v. Shevin*, 407 U.S. at 86, 92 S.Ct. 1983). "Therefore, once the person establishes his property interest in the chattel, he can invoke the protection of the Due Process Clause." *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (citing *Fuentes v. Shevin*, 407 U.S. at 87, 92 S.Ct. 1983). "The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing." *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (quoting *Fuentes v. Shevin*, 407 U.S.

at 87, 92 S.Ct. 1983). "[W]hatever its form, opportunity for that hearing must be provided before the deprivation at issue takes effect ... except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (quoting *Fuentes v. Shevin*, 407 U.S. at 82, 92 S.Ct. 1983).

"The extraordinary situations that justify postponing notice and opportunity for a hearing must be truly unusual and have been allowed in a few limited situations." *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (citing *Fuentes v. Shevin*, 407 U.S. at 90, 92 S.Ct. 1983). "The Supreme Court has only allowed outright seizure without opportunity for a prior hearing when: (1) the seizure 'has been directly necessary to secure an important governmental or general public interest;' (2) 'there has been a special need for very prompt action;' and (3) 'the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.'" *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (quoting *Fuentes v. Shevin*, 407 U.S. at 91, 92 S.Ct. 1983). "These limited situations have involved collecting taxes, meeting the needs of a national war effort, protecting against economic disaster of a bank failure, and protecting the public from misbranded drugs and contaminated food." *Santiago v. Reliable Fin. Servs., Inc.*, 526 F.Supp.2d at 232 (citing *Fuentes v. Shevin*, 407 U.S. at 92, 92 S.Ct. 1983).

However, the Supreme Court has held that although a pre-deprivation hearing is usually required, in certain cases post-deprivation remedies are sufficient. *Zinermon v. Burch*, 494 U.S. at 128, 110 S.Ct. 975. In some cases, "either the necessity

of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful [post-deprivation remedy] ... satisf[ies] the requirements of procedural due process." *Hudson v. Palmer*, 468 U.S. 517, 531–32, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Post-deprivation remedies are held to be sufficient when the deprivation is caused by "a random, unauthorized act by a state employee, rather than by an established state procedure...." *Hudson v. Palmer*, 468 U.S. at 532, 104 S.Ct. 3194 (citing *Parratt v. Taylor*, 451 U.S. at 541, 101 S.Ct. 1908). This is so because "the state cannot predict when the loss will occur" and thus it is "difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Hudson v. Palmer*, 468 U.S. at 532, 104 S.Ct. 3194 (citing and quoting *Parratt v. Taylor*, 451 U.S. at 541, 101 S.Ct. 1908). As such, "[w]hether an individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process." *Hudson v. Palmer*, 468 U.S. at 534, 104 S.Ct. 3194.

Plaintiffs were deprived of their property by the mayor's unauthorized acts. Nevertheless, the defendants' actions were taken pursuant to an ordinance enacted by the municipality. Therefore the actions are not attributable to an established state procedure. Even if it were determined that the defendants intentionally deprived plaintiffs of their rights without providing them with a pre-deprivation procedure, plaintiffs' procedural due process rights would be safeguarded by post-deprivation remedies. It is well settled that "[i]n order to prevail on a claim of a deprivation of procedural due process, '[plaintiffs] must either avail [them]self of the remedies guaranteed by state law or prove that the

available remedies are inadequate.'" *Lamoureux v. Haight*, 648 F.Supp. 1169, 1175 (D.Mass.1986) (quoting *Hudson v. Palmer*, 468 U.S. at 539, 104 S.Ct. 3194). Plaintiffs have done neither. The courts of the Commonwealth of Puerto Rico provide an adequate forum where plaintiffs may be afforded the same remedies that they seek before this court. A plaintiff "[cannot] not sue for damages under 42 U.S.C. § 1983 because state tort law [is] adequate to redress the grievance." *Chongris v. Bd. of Appeals of Town of Andover*, 811 F.2d 36, 44 (1st Cir.1987). "Although the state remedies may not provide ... all the relief which may have been available ... under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *Id.* (quoting *Parratt v. Taylor*, 451 U.S. at 544, 101 S.Ct. 1908). "That state law procedures may not allow one to recover 'the full amount which [plaintiffs] might receive in a § 1983 action is not ... determinative of the [constitutional] adequacy of the state remedies.'" *Chongris v. Bd. of Appeals of Town of Andover*, 811 F.2d at 45 (quoting *Hudson v. Palmer*, 468 U.S. at 535, 104 S.Ct. 3194). The fact that plaintiffs have brought multiple causes of action under the law of Puerto Rico shows that post deprivation remedies are available thus satisfying the procedural due process requirements.

### C. Request for Injunctive Relief

The defendants argue that plaintiffs' claim for an injunction is moot because the municipality resigned its position as administrator of the public housing projects in Barceloneta on October 17, 2007, and ever since then it has not had any roll regarding the administration of the public housing complexes. (Docket 182–3, at 39.) Plaintiffs, however, argue that their claim is not moot because the present controversy is capable of repetition since Ordinance

No. 33, which forbids public housing residents to have pets and allows the municipality to contract with private companies for the pick up and disposal of animals, may be implemented by the defendants without any restraint. (*Id.* at 37–41.)

■■■ "Where a plaintiff seeks permanent injunctive relief, the test is the same [as for preliminary injunctive relief], except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of success.'" *Esso Standard Oil Co. v. Freytes,* 467 F.Supp.2d 156, 159 (D.P.R.2006), *aff'd,* 522 F.3d 136 (1st Cir.2008), (quoting *Caroline T. v. Hudson Sch. Dist.,* 915 F.2d 752, 755 (1st Cir.1990) (quoting *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, [915] (1st Cir.1989))). "In order to issue a permanent injunction, a district court typically must find that (1) the plaintiff has demonstrated actual success on the merits of its claims; (2) the plaintiff would be irreparably injured in the absence of injunctive relief; (3) the harm to the plaintiff from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Esso Standard Oil Co. v. Freytes,* 467 F.Supp.2d at 159 (quoting *United States v. Mass. Water Res. Auth.,* 256 F.3d 36, 51 n. 15 (1st Cir.2001) (citing *A.W. Chesterton Co. v. Chesterton,* 128 F.3d 1, 5 (1st Cir.1997))). "It is well-established that the decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *Brown v. Colegio de Abogados de P.R.,* 579 F.Supp.2d 211, 221 (D.P.R.2008). "With regard to mootness, ... a case seeking only equitable and declaratory relief is not moot if a defendant has voluntarily, but not necessarily permanently, ceased its allegedly unconstitutional conduct." *Spacco v. Bridgewater Sch. Dep't,* 739 F.Supp.

30, 33 (D.Mass.1990) (citing *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)).

Plaintiffs' request for permanent injunction lacks merit for several reasons. Plaintiffs' assertion that injunction is needed because the events that had taken place between October 8 and 10, 2007, were likely to be repeated and review evaded is mistaken. There is no indication that plaintiffs would be irreparably injured in the absence of injunctive relief. The municipality in this case has voluntarily resigned its position as administrator of the public housing complexes and by doing so it is unlikely that future violation will occur. Also plaintiffs have not shown that the municipality has not ceased its alleged unconstitutional conduct. Also, as the defendants correctly point out plaintiffs have failed to identify the particular elements that allow litigation of issues that are capable of repetition but evade review. Specifically plaintiffs have not shown that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that [they would] be subject to the same action again." *Fed. Election Comm'n v. Wis. Right to Life,* 551 U.S. 449, 462, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (quoting *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)). Therefore, I find that plaintiffs' request for an injunction is moot.

### D. Plaintiffs' Claims Under the Law of Puerto Rico

Title 28 U.S.C. § 1367 provides that a "district court may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction...." 28 U.S.C. § 1367(c)(3); *see González–De–Blasini v. Family Dep't,* 377 F.3d 81, 89 (1st Cir.2004); *Claudio–Gotay*

*v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 104 (1st Cir.2004). Also, it is common for district courts not to exercise supplemental jurisdiction over a plaintiff's state law claims when all of its federal claims have been dismissed. *See Educadores Puertorriqueños v. Rey Hernández*, 508 F.Supp.2d 164, 186 (D.P.R.2007) (citing *McBee v. Delica Co.*, 417 F.3d 107, [116] (1st Cir.2005); *González–De–Blasini v. Family Dep't*, 377 F.3d at 89); *Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir.1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Rodríguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir.1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit ... will trigger the dismissal without prejudice of any supplemental state-law claims.").

 Furthermore, "if the federal claims are properly dismissed, the District Court does not abuse its discretion in declining to exercise supplemental jurisdiction over the state-law claims asserted in the case." *Rodríguez Rivas v. Police Dep't of P.R.*, 483 F.Supp.2d 137, 140 (D.P.R.2007) (citing *Ramos–Piñero v. Puerto Rico*, 453 F.3d 48, 55 (1st Cir. 2006)). Accordingly, plaintiffs will be at the "liberty to bring [their] unadjudicated claims before the Commonwealth courts...." *González–De–Blasini v. Family Dep't*, 377 F.3d at 89.

Twelve of the households as plaintiffs in this case have not had their constitutional rights under the Fourth Amendment and Fourteenth Amendment violated, and they have no federal claims left. Therefore, supplemental jurisdiction over these plaintiffs' claims under the law of Puerto Rico should not be exercised. Therefore, I recommend that the court dismiss without prejudice these plaintiffs' supplemental claims.

## V. CONCLUSION

In view of the above, I recommend that summary judgment be GRANTED in part and DENIED in part. I recommend that plaintiffs' Fourteenth Amendment claim against the defendants as well as the request for injunctive relief be. Also, I recommend that the claims of the members of the twelve households mentioned be DENIED since they lack standing to maintain suit against the defendants. Also, it is my recommendation that the defendants' request for qualified immunity, dismissal of plaintiffs' Fourth Amendment claim and section 1983 claim be DENIED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Davet v. Maccarone*, 973 F.2d 22, 30–31 (1st Cir.1992); *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir.1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir.1987); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980).